324 Mass. 509                                                    509

American Institute for Economic Research *v.* Assessors of Great Barrington.

AMERICAN INSTITUTE FOR ECONOMIC RESEARCH *vs.*
ASSESSORS OF GREAT BARRINGTON.

Berkshire.    December 9, 1948. — July 5, 1949.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Charity. Corporation,* Charitable corporation. *Taxation,* Real estate tax:
exemption.

A conclusion by the Appellate Tax Board, that a certain corporation
organized for the purposes of conducting "scientific research" in
economics and of disseminating economic information to the public
and so advancing the public welfare had not sustained the burden of
proving that it was a public charity entitled to exemption from taxation
of its real estate under G. L. (Ter. Ed.) c. 59, § 5, Third, was justified
where the facts found by the board as to the actual operation of the
corporation, including the facts that it disseminated information by
means of publications which were chiefly sold to subscribers and other
purchasers as a business, that nearly all its income was derived there-
from, and that such publications were not distributed gratuitously to
the public to any great extent, showed that it was not conducted as a
public charity.

A ruling, in effect that a taxpayer had sustained the burden of proving
his real estate exempt from taxation "if the evidence introduced by
. . . [him] is true," could not properly have been given by the Appellate
Tax Board where such evidence was susceptible of more than one
rational inference.

APPEAL from a decision by the Appellate Tax Board.

*J. M. Rosenthal,* (*A. R. Pike* with him,) for the taxpayer.

*G. R. McCormick,* for the assessors of Great Barrington.

WILLIAMS, J.    This is an appeal from a decision of the
Appellate Tax Board denying exemption from a local tax
assessed on the real estate of the taxpayer in Great Barring-
ton for the year 1946.    The taxpayer, American Institute
for Economic Research, was incorporated in 1939 under
G. L. (Ter. Ed.) c. 180, for the following declared purposes:
"To conduct scientific research in the general economic
field and to disseminate the results of such research in order
to educate individual students and the general public, so

that there may be more widespread understanding of the fundamental economic relationships affecting the citizens of the United States, both as individuals and as members of a complex economic society, with the ultimate object of advancing the welfare of the American people." The originator of the institute was Edward C. Harwood, a graduate of West Point and a retired army officer. In 1933 he formed an organization to carry on scientific research in the field of economics. In 1939 real estate was acquired in Cambridge for the work of the organization, title to the property being taken by him as trustee under a declaration of trust. After incorporation this property was conveyed to the institute. The property in Great Barrington was purchased in 1945 and the institute moved to that location from Cambridge. The property comprises about eighty acres of land of which some seventy-eight acres with two buildings thereon are located in Great Barrington. In the larger or main building, containing thirty-one rooms, are the faculty offices, the library of some five thousand volumes, offices for clerical assistants, two dining rooms, a large kitchen, pantry, sleeping room for the cook, and a cold room, all located on the ground floor. The upper stories are used as living quarters for the trustee (Mr. Harwood) and his family, the faculty, graduate students and some employees. The other building, described as a tea house, is located some distance away overlooking a lake and is used mainly for recreation purposes.

The by-laws provide that "The trustee who has served under the aforementioned declaration of trust shall serve as trustee under the provisions of these by-laws until his death or voluntary resignation given in writing, and upon the occurrence of either of such events his successor shall be appointed by the faculty of American Institute for Economic Research." "The trustee shall, in behalf of the institute, have the power to collect, sue for, receive and receipt for all sums of money at any time coming due to the said institute; to buy and sell property, both real and personal; to employ counsel; to borrow money and issue

notes to evidence such debts; to mortgage the corporate property; and to do anything else necessary for accomplishing the purposes of the institute. He shall manage such property and exercise the above enumerated powers in accordance with instructions given him from time to time by the faculty of said institute." The governing board of the corporation under its by-laws is a faculty, so called, possessing the powers of directors. The faculty is to consist of those persons who had been associated with Mr. Harwood under the earlier declaration of trust and such others as may be appointed by the executive officer or director with the consent of the faculty. As of 1946 the faculty was composed of four members.

As found by the board, "Research is carried on into the causes of the business cycle, testing the various business cycle theories, studies are made of regional trends in the United States, with special study of the industrial production in the United States, particularly with reference to the variations from what was found to exist with the Federal Reserve Board's index of industrial production and related matters in the field of economics and finance generally. The results of the work of the faculty are printed by an outside firm and appear in the form of booklets, pamphlets, bulletins, reports and the like. Practically all of the income of the institute is derived from the sale of its publications. During the past five or six years the institute published about fifteen booklets. A research report is published each week and an investment bulletin twice monthly. . . . There are between five and six hundred subscribers, described by the institute as 'annual sustaining members.' Each such subscriber pays $35 annually and in return receives all the publications issued by the institute. These subscriptions account for about one fifth of all the income received by the institute. The annual subscription fee for research reports only, but including special bulletins, is $25. From this source the institute receives about two fifths of its income and the remaining two fifths is received from the sale of booklets. The booklets are sold for $1 each. There was no

evidence showing the relationship between the prices charged for the publications and their cost. It has been the practice of the institute, without charge, to distribute pamphlets and literature covering subjects in the field of economics to college students and the public at large upon request. The exact number distributed did not appear in evidence. Subscribers are obtained mainly through advertising and from lists furnished by colleges. . . . Total receipts from all sources were $84,817.47 for 1945, $79,608.73 for 1946 and $86,891.50 for 1947." The by-laws provide for the determination of salaries as follows: (a) "the salary scale of faculty personnel shall be limited to the salaries paid for similar positions in the United States government service, as may be determined from time to time by comparison with the civil service requirements and salary scale of the Federal government"; and (b) "the amount of the trustee's compensation shall be determined by the faculty of American Institute for Economic Research; provided further, that the compensation of the present trustee shall be limited to that received by the more able members of his West Point class who continue in the government service." Salaries were paid to the faculty and employees amounting to $22,203.96 in 1945, $30,849.88 in 1946, and $25,663.96 in 1947.

Upon all the evidence, which is reported, the board found that the institute had not sustained the burden of proving that it is a literary, benevolent, charitable or scientific institution within the meaning of G. L. (Ter. Ed.) c. 59, § 5, Third, and that the taxpayer was not entitled to an abatement of its tax.

The "burden of proof is upon the one claiming an exemption from taxation to show clearly and unequivocally that he comes within the terms of the exemption." *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257.

The subsidiary facts found by the board are supported by the evidence, and the question for decision is whether its ultimate conclusion is consistent with these findings and is warranted as matter of law.

Exemption from taxation is not extended to literary or scientific institutions which are not in the nature of public charities. While the declared purposes set forth in the taxpayer's certificate of incorporation may be found to be charitable, to obtain an exemption the taxpayer must prove that in actual operation the institute is in fact conducted as a public charity. *Assessors of Boston* v. *World Wide Broadcasting Foundation of Massachusetts, Inc.* 317 Mass. 598, 603. *Jacob's Pillow Dance Festival, Inc.* v. *Assessors of Becket*, 320 Mass. 311, 313. *Brockton Knights of Columbus Building Association, Inc.* v. *Assessors of Brockton*, 321 Mass. 110, 114. In *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, 718, it was said, "A foundation for industrial research for the sole purpose of discovering and making generally available more efficient methods of production and distribution might be a charity. But of the multitude of trade organizations and associations existing today in all branches of industry and commerce it is believed that few could pass the test." In this case the board might properly conclude that the use of the property in question is incidental to the conduct of an enterprise maintained for the benefit of a few individuals rather than as a charity for the public. The governing board is a self perpetuating body composed of individuals whose salaries are limited only by the salary scales to which reference is made in the by-laws and for whom living quarters and subsistence are provided. The situation is somewhat analogous to that described in *Phi Beta Epsilon Corp.* v. *Boston*, 182 Mass. 457, where it was said that it could have been found that the dominant use of the property involved was that of a dormitory or boarding house. There is no general dissemination of information free to the public as was the case in *Assessors of Boston* v. *World Wide Broadcasting Foundation of Massachusetts, Inc.* 317 Mass. 598, 603. The institute derives its income from what may be termed the business of selling its publications. It may be inferred that the gratuitous distribution of these publications to the public

is not of large extent. The board was not plainly wrong in failing to conclude that the institute was operated as a public charity and therefore that its property was exempt from local taxation.

The taxpayer assigned as error the denial of certain requested rulings. See *Assessors of Lawrence* v. *Arlington Mills*, 320 Mass. 272, 275. Request numbered 3, that "If the real estate in question was owned and occupied by the appellant or its officers for the purposes for which it was incorporated, it is exempt from taxation," was rendered immaterial by the finding of the board that the taxpayer has not sustained the burden of proving that the dominant purpose of its occupation was that set forth in its certificate of incorporation. *Bottini* v. *Addonizio*, 261 Mass. 456. Request numbered 7, that "If the evidence introduced by the appellant is true, then the appellant's real estate in question is exempt from taxation," which pertains to all of the evidence, could not have been granted. Where, as here, more than one inference rationally may be drawn from the evidence, the question whether the burden of proof resting on a party has been sustained is one of fact and cannot be ruled as matter of law. *Mercier* v. *Union Street Railway*, 230 Mass. 397, 404. *Ambrose* v. *Boston Elevated Railway*, 309 Mass. 219, 222. Supplemental request numbered 4, that "Under the facts in this case, the woodland and other portions of the appellant's property in Great Barrington, not actually occupied by structures, were exempt from taxation," is disposed of by the decision of the board.

There was no error in the denial of these requests.

*Petition for abatement dismissed.*