MASSACHUSETTS MEDICAL SOCIETY *vs.* ASSESSORS OF BOSTON.

Suffolk.    December 9, 1959. — February 3, 1960.

Present: SPALDING, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Taxation*, Real estate tax: exemption. *Charity*. *Corporation*, Charitable corporation. *Medical Society*.

Agreed facts respecting the varied activities of an incorporated medical society showed that such activities were predominantly for the benefit of its members and other members of the medical profession and that charitable aid furnished by the society, services rendered to the public, and indirect benefit to the public through a more enlightened medical profession were only incidental, and the society was not entitled under G. L. c. 59, § 5, Third, to exemption from the real estate tax on real estate owned and occupied by it for its purposes.

APPEAL from a decision by the Appellate Tax Board.

*Edmund L. Twomey*, (*Casimir de Rham, Jr.*, with him,) for the taxpayer.

*William H. Kerr*, for the assessors of Boston.

SPALDING, J.    The Massachusetts Medical Society, hereinafter called the society, appeals from a decision of the Appellate Tax Board sustaining an assessment for the year

1951 on its real estate at 22 The Fenway, Boston.[1]  Contending that it is a benevolent and charitable corporation, the society seeks an abatement by reason of G. L. c. 59, § 5, Third, which, with exceptions not here material, exempts the real estate of "literary, benevolent, charitable and scientific institutions . . . incorporated in the commonwealth" which is "occupied by them or their officers for the purposes for which they are incorporated." See now St. 1957, c. 500.

The case was submitted on agreed facts, which were adopted by the Appellate Tax Board as its findings.  A majority of the board concluded "that the dominant purpose of the society is to promote the personal welfare and advantage of its own members in the profession of medicine and that the ownership and occupation of the real estate and the society's activities are primarily directed to that end and any benefit accruing to the general public is incidental thereto."

The real estate in question "consists of approximately 4,000 square feet of land with a four story structure with basement and subbasement facilities." The building contains the offices of the society's president, treasurer, secretary, director of medical information and education, and of the Postgraduate Medical Institute.  It has a meeting room seating approximately fifty persons and two smaller committee rooms where the meetings of the society's committees are held.  The property was purchased by the society in 1950 and since May, 1951, has been occupied by it "for the charitable and scientific purposes for which it was incorporated."

The society was incorporated by St. 1781, c. 15.  The purposes for which it was formed "may be summarized as the preservation and recovery of health through a knowledge of the animal economy and the properties and effects of medicine and the encouragement of medical institutions."

---

[1] Appeals relating to the years 1952 to 1957, inclusive, have been entered, but by stipulation they are to remain inactive until the final disposition of this case.

"To become a member of the society a person must be twenty-one years of age, must have a degree from a medical school approved by the council or have received the approval of the committee on membership, must have received a license to practise medicine within the United States or its territories and must appear before the censors and pass an examination." As of May 1, 1951, the society had slightly less than 7,000 members.

The society has the following sources of income: dues from its members, income from the publication of the New England Journal of Medicine, and income from invested funds. The annual dues are $35. Each member is entitled to use the Boston Medical Library by reason of the society's annual payment of $5 per member. Each member also receives without charge (but at an annual cost to the society of $4 per member) a subscription to the New England Journal of Medicine.

The funds of the society are used for purposes and to the extent indicated in the margin.[1] Of the many activities of the society, the more important ones are these. The society publishes the New England Journal of Medicine which has a world wide circulation of over 50,000. The journal "affords to practising physicians, medical instructors, medical students and others interested in medical matters the means of keeping in touch with current advances in medical knowledge and techniques." The society sponsors and contributes to the operation of the Postgraduate Medical Institute, which

---

[1] Boston Medical Library ............................ 15.9%
New England Journal of Medicine .................... 13.5%
General administrative expense .................... 13.5%
Salaries of officers .............................. 12.1%
Postgraduate Medical Institute .................... 7.7%
Medical information and education ................. 7.2%
Maintenance of society headquarters ............... 5.9%
Benevolence ....................................... 5.1%
Expenses of officers .............................. 3.1%
Expenses of committee on State legislation ........ 2.1%
Expenses of other committees ...................... 3.0%
Expenses of printing directory .................... 2.7%
Charitable and educational fund ................... 2.6%
American Medical Education Foundation ............. 1.5%
Expenses of delegates to medical society meetings . 1.2%
Miscellaneous ..................................... 2.9%

arranges courses in various branches of medicine for the benefit of active practising physicians and publishes and distributes to all practising physicians in New England, without charge, a monthly schedule of medical meetings, lectures and seminars at hospitals and medical schools. Through its director of medical information and education, the society conducts a public health program and maintains a speakers' bureau which furnishes physicians without charge to speak on medical and health topics.

The society's committee on State legislation reviews legislative petitions relating to health and medicine, sponsors legislation considered to be in the public interest, and opposes legislation that is not so considered. Annual grants are made to the Massachusetts Medical Benevolent Society, a Massachusetts charitable corporation organized for the purpose of affording pecuniary assistance to needy doctors, their widows and children. To be eligible for such aid a doctor need not be a member of the society.

Through its committee on ethics and discipline, the society investigates all complaints concerning unsatisfactory or unethical medical practice and, where warranted, takes appropriate disciplinary action.

A grant of $1,000 each is made annually to the medical schools of Harvard, Tufts and Boston University for the benefit of needy medical students. An annual award is also made to a graduating student of outstanding ability of each of these schools.

The society operates a twenty-four hour telephone service in Greater Boston to provide doctors in emergencies. In one year more than a third of such calls were referred to nonmembers of the society. It also operates a placement service to locate and provide physicians for communities where medical coverage is inadequate.

A weekly television program relating to various medical subjects is sponsored by the society for the education of the public, and radio stations are furnished with transcriptions dealing with subjects relating to health.

Since the case was submitted on agreed facts, the ques-

tion is whether as matter of law these facts warrant the conclusions of the board and the general finding for the assessors. *Assessors of Boston* v. *Lamson*, 316 Mass. 166, 168.

In *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, a case which has many features in common with the case at bar, the governing principles of law were fully and well stated, with ample citation of authorities, by the then Mr. Justice 'Qua. It was there said, "Normally all property of a taxable nature should contribute its proportionate share to the support of the State. Exemption from taxation is a matter of special favor or grace. It will be recognized only where the property falls clearly and unmistakably within the express words of a legislative command" (p. 716).

In the leading case of *Jackson* v. *Phillips*, 14 Allen, 539, it was said per Gray, J., "A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government" (p. 556). As we have said many times, charity and charitable corporations are not limited to almsgiving, but comprehend a wider field of activity for the improvement and happiness of man. *New England Sanitarium* v. *Stoneham*, 205 Mass. 335, 342. *Springfield Young Men's Christian Assn.* v. *Assessors of Springfield*, 284 Mass. 1, 7. *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, 717. While new objects have been and must be added to comprehend the wide variety of gifts which may be classed as charitable, "the more remote the objects and methods become from the traditionally recognized objects and methods [— relief, religion, education and public works —] the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from

the burdens of government." *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 718.

Whether an institution is in its character literary, benevolent, charitable or scientific will depend upon the declared purposes and the actual work performed. *Assessors of Boston* v. *Garland School of Home Making,* 296 Mass. 378, 384. *Workmen's Circle Educ. Center of Springfield, Inc.* v. *Assessors of Springfield,* 314 Mass. 616, 618. An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work. *Little* v. *Newburyport,* 210 Mass. 414, 417. *Newton Centre Woman's Club, Inc.* v. *Newton,* 258 Mass. 326, 331. *Workmen's Circle Educ. Center of Springfield, Inc.* v. *Assessors of Springfield,* 314 Mass. 616, 618. *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712. *American Inst. for Economic Research* v. *Assessors of Great Barrington,* 324 Mass. 509, 513.

In the light of these principles, we are of opinion that the decision of the board denying the exemption was right. The declared purposes of the society indicate that it is operated primarily for the betterment of a particular limited group of persons. And confirmation that it is so operated may be found in many of its activities and expenditures. In so far as it pays the charges entitling its members to use the Boston Medical Library and sends its members the New England Journal of Medicine without additional cost to them, the society is performing a service that benefits only its members. Even the society's broader activities (world wide distribution of the journal, supervision of medical ethics, and educational services) are carried on primarily for the benefit of the medical profession. There are, to be sure, charitable benefits that are given by the society to aid needy medical students and needy doctors and their families. But these benefits constitute but a small percentage of

the society's funds and are incidental to its main objectives.

There can be no doubt that the work of the society is most laudable; it is aimed at improving the knowledge and skills of the medical profession. That a more enlightened medical profession benefits the public cannot be gainsaid. But this indirect benefit is not sufficient to bring the society within the class traditionally recognized as charities. In this respect the case at bar closely resembles *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712. There, though the objectives of the chamber of commerce included the promotion of trade and commerce which the court recognized as "highly commendable and of great public benefit" (p. 718), it was held, nevertheless, that since the primary benefit would accrue to the business community rather than to the public it was not entitled to an exemption. Other decisions somewhat analogous are *Newcomb* v. *Boston Protective Dept.* 151 Mass. 215 (corporation formed for the purpose of preventing fires and saving lives and property at fires held to be primarily for the benefit of members, who were insurers, and was not charitable), and *American Inst. for Economic Research* v. *Assessors of Great Barrington,* 324 Mass. 509 (corporation formed for the purpose of conducting scientific research in economics and disseminating economic information chiefly to subscribers but also to the public at large without charge was held not to be charitable).

Cases in other jurisdictions construing exemption statutes differing from ours are not very helpful; but for cases tending to support the conclusion here reached see *American Medical Assn.* v. *Board of Review,* 392 Ill. 614; *International College of Surgeons* v. *Brenza,* 8 Ill. (2d) 141; *People* v. *Neff,* 34 App. Div. (N. Y.) 83. Compare *Dulles* v. *Johnson,* 273 F. 2d 362 (2d Cir.).

*Petition for abatement dismissed.*