Carroll *v.* Commissioner of Corporations & Taxation.

JAMES E. CARROLL & others, executors, *vs.* COMMISSIONER
OF CORPORATIONS AND TAXATION.

Middlesex.    November 8, 1961. — December 28, 1961.

Present: WILKINS, C.J., WILLIAMS, WHITTEMORE, CUTTER,
& SPIEGEL, JJ.

*Charity. Corporation,* Charitable corporation. *Forestry. Taxation,* Succession tax.

A forestry foundation incorporated under G. L. c. 180 for stated purposes related to the improvement of forest management and the public interest therein and engaged in giving addresses and publication and distribution of articles on forestry subjects, in demonstrating forest management on demonstration forests owned by it, in formulation of forest management plans for municipalities, in operation of forestry management centers, in spreading word of a public program, and, as a principal activity producing most of its income, in furnishing for a fee to owners of small woodlands a "complete forestry service" including assistance in marketing timber, was, on the facts, predominantly operated for the public good and was a "charitable, educational" corporation so that a legacy to it was exempt from the succession tax under G. L. c. 65, § 1.

PETITION filed in the Probate Court for the county of Middlesex on June 30, 1960.

The case was reported by *Monahan,* J.

*Arthur Brogna,* for the petitioners.

*Herbert E. Tucker, Jr.,* Assistant Attorney General, for the Commissioner of Corporations and Taxation.

WHITTEMORE, J.  The petitioners, acting under G. L. c. 65, § 27, as amended, sought in the Probate Court an abatement of an inheritance tax certified on or about February 24, 1960, on a legacy under the will of Louise Ayer Hatheway to New England Forestry Foundation, Inc. (the Foundation).  The probate judge reported the case on a statement of agreed facts.  We hold that the abatement is due.  The Foundation is within the class of a "charitable, educational . . . [society] organized under the laws of . . . the commonwealth" and the legacy to it is within the express exemption of G. L. c. 65, § 1, as amended.

The test under G. L. c. 65, § 1, "is whether the society . . . is one whose property is generally exempt from taxation under G. L. (Ter. Ed.) c. 59, § 5." *Old Colony Trust Co.* v. *Commissioner of Corps. & Taxn.* 331 Mass. 329, 333. The criteria under c. 59, § 5, are " '. . . the language of its charter or articles of association, constitution and by-laws, . . . the objects which it serves and the method of its administration' (*Little* v. *Newburyport,* 210 Mass. 414, 415), that is, '. . . its purposes declared and the work done.' *Parkhurst* v. *Treasurer & Receiver General,* 228 Mass. 196, 199–201." *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378, 384. *Massachusetts Medical Soc.* v. *Assessors of Boston,* 340 Mass. 327, 332. "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose." *Ibid.,* p. 332.

The Foundation was organized in 1944 under G. L. c. 180. Its principal purposes are inclusive of work for the public good. They are stated thus: "To increase the production of timber through the extension of the practice of forest management; to provide forestry service to woodland owners; to arouse and educate a public interest to the advantages of forest land use and management through practical demonstration, and to promote better methods in the protection, development and marketing of forest resources and forest products."

The Constitution of the Commonwealth, in its Amendments, provides: (art. 49) "The conservation, development and utilization of the agricultural, mineral, forest, water and other natural resources of the commonwealth are public uses, and the general court shall have power to provide for the taking, upon payment of just compensation therefor, of lands and easements or interests therein, including water and mineral rights, for the purpose of securing and promoting the proper conservation, development, utilization and control thereof and to enact legislation necessary or expedient therefor"; (art. 41) "Full power and author-

ity are hereby given and granted to the general court to prescribe for wild or forest lands such methods of taxation as will develop and conserve the forest resources of the commonwealth." General Laws c. 21, § 1, provides for a department of natural resources with the duty "to exercise general care and oversight of the natural resources of the commonwealth . . .. The words 'natural resources' . . . include . . . forests . . .."

The agreed facts show that, as the Foundation functions, work for the public good is its dominant activity.

New England's millions of acres of forests are mostly in private ownership. In 1944 the percentage was ninety-five. More than half of the privately owned land is in very small holdings. In 1944 sixty per cent of the private forests were owned by 243,719 persons, the average holding being seventy-two acres. In 1945 none of the small holdings was intensively managed. More than half of these holdings were without any forest management. A 1945 survey by the United States Forest Service indicated that "the management of small tracts . . . [was] much inferior to that on the large holdings . . . [and] the large owners could greatly increase the productiveness of New England's forest by increasing the intensity of their management." A 1949 survey "found that 96% of the owners holding three-fourths of the small woodland acreage, had occupational interests that did not require the use of their forest land for timber." Over half of the properties and two-fifths of the acreage were held "for reasons other than their timber values." The continuing predominance of small holdings is confirmed by 1953 statistics of the United States Forest Service.

The incorporators of the Foundation were individuals none of whom was engaged in the timber business. The Foundation receives donations. None of its earnings inures to the benefit of any member. None of its officers is paid except the secretary-treasurer, a full time employee who receives $5,000 a year. The work of the Foundation is addressed primarily to improving the management of small

forestry holdings. It employs nineteen resident foresters. Through its secretary and foresters the Foundation gives addresses to clubs, granges, societies, colleges, and on the radio. The subjects are forestry, forest management, conservation and fire protection, and the facilities of the Foundation. It prepares articles for publication in forestry magazines and newspapers, explaining the need for forest management and the facilities of the Foundation. It distributes to small owners Federal and State publications on forestry. It owns ten public demonstration forests in Massachusetts, Maine, and New Hampshire, containing about 2,000 acres in the aggregate, and therein demonstrates the benefits of the practical application of established principles of forest land management. The Foundation has some income from the sale of timber from these forests. It has formulated forest management plans for seven municipalities in Massachusetts, three in New Hampshire, and one in Maine, for which regular rates were charged. In the four northern New England States, the Foundation operates forestry management centers staffed by resident foresters who have university training.

The principal income of the Foundation, about ninety-two per cent, comes from its "complete forestry service" to those small woodland owners who seek the service. This service consists of (1) tree planting; (2) weeding and thinning; (3) timber stand improvement procedures; (4) tree marking for selective cutting; (5) making of timber sale agreements; (6) supervision of the cutting and logging operations and the marketing of the timber; (7) practice of protective measures for insect, disease, and fire control; (8) woodland examinations; and (9) forestry management plans. The fee to the owner is based upon an hourly rate for the services of a forester and, if timber is sold, there is an additional charge of twelve and one-half per cent of the sale price on sales of less than 150,000 board feet and ten per cent on sales of more than 150,000 board feet. About eighty-five per cent of the time of foresters is devoted to this service to small owners, about ten per cent is spent in

the demonstration forests, and five per cent is devoted to talks. In the period 1944 through 1959 the Foundation sold for owners 134,000,000 board feet of timber. In 1946 the Foundation served seventy owners; in 1959 it served 2,137.

State and Federal forestry services, "although limited in manpower," give advice to private owners and "spend a limited amount of time rendering these same services to them." In Maine this time may be up to three weeks to an individual owner, in New Hampshire two days, in Vermont one week, and in Massachusetts three days. In Massachusetts the service by public agencies is confined by practice to owners of fifty acres or less of forest land. The Foundation renders the same services except that it makes a charge and "its facilities are aimed mainly at reaching the owner of five hundred acres or less of forest land."

The Foundation spreads word of the Federal conservation program in coöperation with the States which furnishes seedlings below cost, and "in . . . 1959 . . . planted for owners . . . 288,000 seedlings."

The contention of the Commissioner that the dominant purpose of the Foundation is to benefit the limited class of small forestry owners (see *Massachusetts Medical Soc.* v. *Assessors of Boston,* 340 Mass. 327, 332) disregards that which is explicit and implicit in the statement of facts and in the Constitution and statutes of the Commonwealth. Many of New England's forests have not been well managed; it is in the general public interest that this waste of natural resources be overcome; the effective way to do this is to demonstrate to the owners by actual results on their wood lots that it is economically feasible to practise sound forestry. Teaching the private owners of a public resource to weed from their wood lots unproductive trees, to trim stands for maximum growth of best trees, to practise selective cutting rather than wasteful clear cutting, and to protect timber stands against insects, disease and fire, is education; it is education which serves a constitutionally and statutorily declared public interest and it is thus, in the

significant general sense, charitable, notwithstanding the substantial income from its work.   *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378.   See *Boxer* v. *Boston Symphony Orchestra, Inc.* 342 Mass. 537, 539–540, and cases cited.

There is no suggestion or basis for assuming that the educational and charitable purposes of the Foundation have been accomplished so that its only significant present activity is the business of acting as agent in the marketing of the timber.   That activity remains incidental to the main purpose notwithstanding that it is, suitably, a principal source of income.   An important part of the educational process is to show to the owner that, even though he pays for all services, he can economically practise sound forestry.

The burden of proof, which is on the petitioners (*Assessors of Dover* v. *Dominican Fathers Province of St. Joseph,* 334 Mass. 530, 537), has been sustained.

A decree is to be entered in the Probate Court abating the tax.

*So ordered.*