Board of Tax and Land Appeals
No. 2004-621

APPEAL OF TOWN OF WOLFEBORO
(New Hampshire Board of Tax and Land Appeals)

Argued: May 10, 2005
Opinion Issued: July 19, 2005

*Barto and Puffer, P.A.*, of Concord (*Mark H. Puffer* on the brief and orally), for the petitioner.

*Martin, Lord & Osman, P.A.*, of Laconia (*Marshall D. Hickok* on the brief and orally), for the respondent.

*Mitchell & Bates, P.A.*, of Laconia (*Walter L. Mitchell* and *Laura A. Spector* on the brief), for the Town of Sandwich, as *amicus curiae*.

DALIANIS, J. The petitioner, Town of Wolfeboro (Town), appeals a decision of the board of tax and land appeals (BTLA) granting a charitable tax exemption to property owned by the respondent, Taylor Home (Home). We reverse.

The Home operates an elderly housing complex in Wolfeboro known as Back Bay. The units at Back Bay are independent living units. The Town denied the Home's request for a charitable exemption for the tax year 2002 under RSA 72:23, V (2003). The Home appealed this decision to the BTLA, arguing that it was entitled to a charitable exemption because it was a recognized charitable organization, and the property was used and occupied directly for charitable purposes.

The BTLA relied upon our decision in *Appeal of City of Laconia* in granting an exemption. *City of Laconia* involved a similar inquiry before

both the BTLA and this court, concerning the Home's elderly housing complex in Laconia. *Appeal of City of Laconia*, 146 N.H. 725, 726 (2001). The Laconia complex includes independent living, assisted living and nursing care facilities. *Id.* In that case, we upheld a ruling that the Home was a charitable organization for the purposes of a property tax exemption based upon the BTLA's findings, including its finding that the Home provided a public service by alleviating the burden on the government of caring for the elderly and its finding that the Home cares for its residents for life, regardless of their ability to pay. *Id.* at 728.

We also upheld the BTLA's ruling that the Laconia property was used and occupied directly for its charitable purpose. *Id.* The evidence supporting this ruling included that the Home offered its assisted living units at approximately fifty percent of the market rate, that the fees for the residents in the independent living units were between $125 and $270 per month, and that the Home had provided over $2 million in entry fee assistance, as well as $700,000 in monthly fee assistance annually. *Id.* The BTLA also found that the independent living units at the Laconia complex

> [are] one of the main "money engines" generating funds necessary to carry out [the] Home's legislative purpose. Just as fund raising is the lifeblood of most charitable organizations, cost shifting at [the] Home provides a significant source of funds for providing charitable assistance to older residents requiring intensive assisted or nursing care services.

*Id.* at 729. The City of Laconia did not challenge this finding by the BTLA. *Id.*

The distinction between Back Bay and the property in Laconia is that Back Bay is made up entirely of independent living units. There are no assisted living or nursing care facilities at Back Bay. Though all residents at Back Bay signed a life care agreement in 2002, identical to that signed by residents at the Laconia property, the Home also offered a separate residence agreement, which allows people to reside in Back Bay without contracting for the assisted living and nursing care components.

All residents, whether they enter into the contract with the Home for assisted living and nursing care or not, must pay an entry fee for the right to live at Back Bay. In addition, each resident must pay a monthly fee for occupancy. In 2002, the entry fee for Back Bay was $140,000; the average monthly fee, which varied according to the size of the unit was $900. Twenty percent of the entry fee was non-refundable, the remaining eighty percent was refundable over a period of ten years.

Residents of independent living units are responsible for paying for all of their utilities, except curbside trash pickup. There are services available

to the residents of Back Bay that may not be available to residents of an ordinary housing development; for example: a service that delivers frozen meals, housekeeping services, laundry services, some transportation services and care management services, which "[help] Residents to arrange for and coordinate needed services." All Back Bay residents must pay additional costs above their monthly fee for these services, except for the care management services.

Independent living residents, who have signed a life care agreement, have a contractual right to enter the nursing care facility at the Home, provided that, just as in any other nursing facility, a doctor or healthcare provider has certified their need for nursing care. These residents do not have a similar right to enter the assisted living units, but are given a preference when units are available. When such a resident needs to move from independent living to assisted living or nursing care, no additional entry fee is required. The resident is still required to pay monthly or daily fees while in the assisted living or nursing care facilities, depending upon the length of the stay. The monthly fee for assisted living at the Home in 2002 was approximately $2,000. The monthly fee for nursing home care was comparable to the average rate charged by other facilities, though the Home asserts that its accommodations and care exceed the average.

The Home is one corporation. All of its employees work for the same organization. The Home does not, and claims that it cannot, separate revenue or costs of Back Bay from its other facilities. It asserts that its satellite facilities, of which it has several, made up entirely of independent living units, were established to subsidize the operation of the Home as a whole. As its costs increased due to the number of people entering assisted living or nursing care, the Home chose to expand the number of residents, rather than pass greater costs on to its existing residents. The independent living units can also be liabilities, however, because adding more residents increases the number of those who might one day require assisted living or nursing care at the Home's expense.

It is the Home's policy that no resident be forced to leave "based solely on a financial inability to make the required monthly payments." No nursing care resident will be asked to leave the Home due to nonpayment. The Home has funds to subsidize entry fees and monthly fees if necessary. The Home takes $10,000 from each new entry fee and transfers it immediately to the charitable admission trust fund. As of the date of the BTLA hearing, however, no resident of Back Bay had received a subsidy for either entry fees or monthly fees. Finally, by its contract with the State, the Home is prohibited from seeking reimbursement from either Medicare or Medicaid for the care it provides.

Based upon the above facts, the BTLA found that the property in Wolfeboro was "an integral and inseparable component of the Taylor Home community based in the City of Laconia and, thus, qualifies for an RSA 72:23, V charitable exemption." In addition, the BTLA stated:

> In summary, there is nothing in the record before the board to suggest a viable legal distinction can be drawn between [the] Home's operations in the Town and its operations in Laconia, which have already been found to be charitable. There is also no evidence [the] Home operates the Back Bay independent living units in the Town any differently than it operates The Ledges independent living units in Laconia. In each case, residents have the same access to assisted living and nursing care facilities, if and when such needs should arise, as well as the additional "care management" services noted above.

The Town challenges this ruling on appeal, arguing that Back Bay is not owned, used and occupied directly for charitable purposes as required by RSA 72:23, V. The Town argues further that the independent living units are not reasonably necessary to the Home's charitable purpose, and that there is no evidence of cost shifting or that revenue from the Back Bay is subsidizing the services provided in Laconia. The Home urges us to affirm the BTLA's findings and rulings, as Back Bay is integral to the functioning of its Laconia complex.

Appeals from BTLA decisions are governed by RSA chapter 541. RSA 71-B:12 (2003). To prevail, the Town must show that the BTLA's decision was clearly unreasonable or unlawful. Findings of fact made by the BTLA on questions properly before it are deemed *prima facie* lawful and reasonable. Its decision "shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13 (1997). The interpretation of a statute is to be decided ultimately by this court. Therefore, if we find that the board misapprehended or misapplied the law, its order will be set aside. *Appeal of Kiwanis Club of Hudson*, 140 N.H. 92, 94 (1995).

RSA 72:23 exempts the following real estate and personal property from taxation:

> V. The buildings, lands and personal property of charitable organizations ... owned, used and occupied by them directly for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established.

RSA 72:23, V. "The burden of demonstrating the applicability of any exemption shall be upon the claimant." RSA 72:23-m (2003).

We have had occasion to examine the use of property as residences in the past. *See The Housing Partnership v. Town of Rollinsford*, 141 N.H. 239, 242 (1996). We have recognized that the fact that property owned by a charitable organization is rented to individuals who use the property as their living quarters does not prevent the property from being tax exempt. In order for a residence to qualify for a tax exemption, the occupancy of the property must be reasonably necessary for the charitable organization to carry out its mission. *Id.*

We recognize that the Home does not characterize its agreements as rental agreements and that it claims that no real property interest is created by its contract with its occupants. We need not decide this issue. The residents of the units at Back Bay are paying for, among other things, the right to reside in their units undisturbed. This arrangement is similar enough to rental agreements that rental property cases are helpful.

This case differs from some of our previous cases addressing property owned by a charitable organization that is rented to an individual, in that the purpose of this charitable organization is, in fact, to provide housing. *Cf., e.g., St. Paul's School v. City of Concord*, 117 N.H. 243, 252 (1977) (where charity in question was school, rental property used for educational purposes was exempt); *Alton Bay Camp Meeting Asso. v. Alton*, 109 N.H. 44, 49 (1968) (where charity in question was religious organization, rental property used for secular purposes was not exempt).

Instead, this case is more akin to *Senior Citizens Housing Development Corp. of Claremont v. City of Claremont*, 122 N.H. 1104 (1982), and *Housing Partnership*. In *Senior Citizens*, the purpose of the charity was to promote the welfare of needy elderly and handicapped people through the provision of housing for low and moderate income individuals. Tenants generally paid twenty-five percent of their income as rent. *Senior Citizens*, 122 N.H. at 1106. We stated, "[I]f the rentals directly fulfill the organization's charitable purpose, or are necessary for the organization to accomplish its purpose, an exemption will be allowed." *Id.* at 1108. We rejected an argument that the units were not occupied and used by the charity because its tenants had exclusive control of them, and found that the rentals directly fulfilled the organization's charitable purpose. *Id.* at 1107.

In *Housing Partnership*, we addressed a similar issue. The purpose of the organization in that case was to facilitate the development and preservation of decent, safe and affordable housing for low and moderate income persons. *Housing Partnership*, 141 N.H. at 241. The organization owned several apartment buildings and rented them to tenants. *Id.* at 240.

The organization's by-laws established a number of services provided to its residents, including: providing public education and advocacy in support of affordable housing, developing housing projects with long-term affordability and obtaining financing for such projects using a combination of resources. *Id.*

The rents for the properties were close to market levels, and the benefit provided by the organization was rent stability, not below-market rent. *Id.* at 243. The rents charged were based upon the operating costs of the properties, and were increased as the operating costs increased, distinguishing the case from *Senior Citizens*, where the benefit to the tenants did not depend upon fluctuating market costs. *Id.* at 244. In addition, unlike the housing in *Housing Partnership*, the housing in *Senior Citizens* was for the elderly and disabled; such housing is often modified to accommodate the special needs of the elderly and disabled. *Id.* at 243.

We concluded that the tenants in *Housing Partnership* "pay close to market rates and receive no special benefits from living in the property, and as a result, the occupancy of the property by the tenants is not a direct use of the property for the plaintiff's charitable purposes." *Id.* The plaintiffs failed to demonstrate that the property was not simply an adjunct to its charitable purpose. *Id.* at 243-44 (when property is owned and rented commercially as an adjunct to a charitable purpose, no tax exemption is allowed under RSA 72:23, V).

We find that this case is more similar to *Housing Partnership* than it is to *Senior Citizens*. The independent living units at the Back Bay cannot be the sole basis for a charitable exemption, as they are not used and occupied directly for the Home's charitable purpose.

The Home provides its charitable services in Laconia. There is very little separating Back Bay, in Wolfeboro, from an ordinary rental housing development. Here, as in *Housing Partnership*, there is no evidence that the rents are below market rate. Indeed the monthly occupancy fee varies with the size of the unit occupied, much as it would on the real estate rental market. Unlike *City of Laconia*, there was no evidence of financial assistance given to residents. *City of Laconia*, 146 N.H. at 728. Further, the residents at Back Bay receive no special benefits as a result of their residency. *See Housing Partnership*, 141 N.H. at 244. The occupants of the independent living units must pay for all of their utilities. Many of the services available to Back Bay residents, which distinguish it from a standard property development, are only available at an extra cost to the resident. A resident at another housing development in Wolfeboro would have to pay extra for laundry, meals and housekeeping services, just like a resident at Back Bay.

It is the Home's policy that no one be asked to leave due to a financial inability to continue to make monthly payments, but no evidence was presented on how the Home makes these funds available; it is not clear whether the Home has absolute discretion in deciding which residents receive charitable assistance. This uncertainty further distinguishes this case from *Senior Citizens*, where the rental assistance was standardized. *Senior Citizens*, 122 N.H. at 1106.

The residents at Back Bay who signed the life care agreements are entitled to a preference, should they need transfer to assisted living care at the Home's Laconia facility, and they have a right to enter nursing care should that need arise. These rights have their source in the contract between the resident and the Home. Little distinguishes them from similar rights acquired by signing a contract with a different assisted living or nursing care facility.

The *one* distinguishing characteristic is the Home's policy not to evict a resident from its nursing care facility for non-payment. This contingency, however, is not enough to transform the character of the independent living units at Back Bay into use and occupation directly for the charitable purposes of the organization. The Home presented evidence that an estimated twenty-five to thirty percent of its independent living residents will one day require nursing care, and evidence that several of the residents at the Back Bay in 2002 *might* develop the need for financial assistance, should they enter nursing care. There is little but a theoretical future use of the charitable services available in Laconia that would distinguish Back Bay from any ordinary commercial rental facility.

We do not rely upon the availability of a separate residence agreement, specifically excluding the resident from assisted living or nursing care, because none of the Back Bay residents for the tax year in question entered into this type of agreement. We note, however, that the availability of this arrangement casts further doubt upon the use and occupancy of the property for charitable purposes.

Nor are the independent living units at Back Bay reasonably necessary for the Home to accomplish its charitable purpose. *See Housing Partnership*, 141 N.H. at 242. The BTLA noted in its ruling that the Town did not challenge its finding in *City of Laconia* that the independent living units, assisted living units and nursing care facilities all "work in concert to fulfill [the Home's] charitable mission." *City of Laconia*, 146 N.H. at 729. Whether the elements of the Home "work in concert" towards its charitable purpose is not the test; rather, the independent living units must be reasonably necessary for the Home to accomplish its charitable purpose. *Housing Partnership*, 141 N.H. at 242.

Although we did not disturb the BTLA's findings, in *City of Laconia*, that the independent living units were the "main 'money engines'" of the Home and provided a significant source of funds for its charitable purpose, we note that the City of Laconia did not dispute those findings on appeal. *City of Laconia*, 146 N.H. at 729. In this case, however, the Town does challenge the use and existence of the funds generated by the independent living units at Back Bay.

The BTLA, relying upon our decision in *City of Laconia*, concluded that Back Bay was "integral" to the Home and referred to the "financial necessity of the independent living units to carry out the charitable goals of [the] Home ...." This conclusion is unsupportable, however, as the Home presented neither evidence of Back Bay's revenues, nor evidence of how those revenues supplemented the Home's operation as a whole. The burden of demonstrating the applicability of the charitable exemption was on the Home. *See* RSA 72:23-m. It did not meet its burden.

The BTLA also based its holding in part upon "the legal integration of the Property with the Laconia Taylor Home facilities." While it is true that the integrated activities of the organization as a whole must be considered in order to determine eligibility for tax exemption, *St. Paul's School*, 117 N.H. at 250, legal integration alone is not enough. The BTLA stated, "[T]here is nothing in the record before [us] to suggest a viable legal distinction can be drawn between [the] Home's operations in the Town and its operations in Laconia, which have already been found to be charitable." Each property owned by an organization must be examined according to its particular use, however. For example, in *St. Paul's School*, the examination focused on particular buildings on one campus, granting and denying exemptions based on each item's particular use. *See id.* at 251-59. The *City of Laconia* case presented different charitable uses and unchallenged evidence to support those uses. The absence of evidence of a charitable use in the present case creates a viable legal distinction.

■ We will not grant the benefit of a charitable tax exemption to a residential housing development, which happens to operate under the corporate umbrella of a charitable organization, without more than was presented here. We hold, therefore, that the record in this case does not support a finding that the independent living units at Back Bay are used or occupied directly for the Home's charitable purposes, or are reasonably necessary for the Home to accomplish its charitable purpose. Because we

conclude that the BTLA's order is unreasonable, we reverse its ruling that the Home is entitled to a tax exemption for the property in Wolfeboro.

*Reversed.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.