Board of Tax and Land Appeals
No. 2009-491

APPEAL OF CITY OF CONCORD
(New Hampshire Board of Tax and Land Appeals)

Argued: June 10, 2010
Opinion Issued: January 13, 2011

*Rath, Young & Pignatelli, P.C.,* of Concord (*Christopher J. Sullivan* and *Jason M. Tanguay* on the brief, and *Mr. Sullivan* orally), for Home Care Association of New Hampshire.

*Gardner Fulton & Waugh, P.L.L.C.,* of Lebanon (*Adele M. Fulton* on the brief and orally), for the City of Concord.

HICKS, J. The City of Concord (City) appeals orders of the board of tax and land appeals (BTLA) ruling that the taxpayer, Home Care Association of New Hampshire (HCA), is entitled to a charitable tax exemption under RSA 72:23 (Supp. 2010) and denying the City's motion to have an attorney sit as a board member. We vacate and remand.

The following facts were found by the BTLA or appear in the record. HCA is a voluntary corporation organized under RSA chapter 292 and is a tax exempt organization under section 501(c)(3) of the Internal Revenue Code. *See* 26 U.S.C. § 501(c)(3) (2006). According to its articles of association, HCA's objectives are:

> 1. To promote not-for-profit home health care and related services.
>
> 2. To promote programs and services directed toward the prevention of illness, the encouragement of good health practices and the overall protection of the public's health.
>
> 3. To work with other groups, associations, agencies and individuals toward coordination, increased effectiveness and availability of human services for all residents of the State of New Hampshire.

HCA describes itself in its mission statement as "a membership organization." Its bylaws provide for three categories of membership: (1) provider membership, which is open to New Hampshire licensed "providers of home health, homemaker, hospice, or other home care services exclusive of home medical equipment providers"; (2) affiliate membership, which is open to "home medical equipment providers; case management providers; organizations providing products and/or services to home care providers; non-licensed providers of home care products and/or services and other organizations doing business with home care providers or interested in [HCA's] mission . . . , such as insurers, intermediaries and other trade and membership associations"; and (3) individual membership, which is open to any person, not associated with an agency eligible under another membership category, "who subscribes to the stated purpose and objectives of" HCA and pays the prescribed membership dues. The BTLA found that "[a]pproximately one-quarter of the members of HCA are for-profit agencies."

HCA's mission statement states that HCA is an "organization which enhances the ability of agencies providing home health care to deliver quality services to New Hampshire residents." The statement further provides that HCA performs its "mission through education, networking, research, leadership, and public policy advocacy." The BTLA found that HCA "provides home health care related education and training programs, which are open to the general public, that are intended to further [HCA's] stated objectives." The BTLA also found that HCA maintains a website through which users, including the general public, can obtain "information about home care and its role in health care delivery, . . . search for home care providers, and . . . learn about education programs designed to further [HCA's] objectives." The website lists only home care providers that are members of HCA. In addition, HCA maintains a toll free telephone number for inquiries from the general public about home health care.

HCA has a wholly-owned subsidiary, Granite State Home Health Association (GSHHA), that lobbies the state legislature on behalf of HCA's members. The BTLA found that "[t]he governance, staffing and activities of HCA and GSHHA, as well as their use of . . . [office space], are interdependent and inextricably intertwined."

HCA owns a building at 8 Green Street in Concord, which it uses as its only office. It shares that office space with GSHHA. It leases the second floor, or approximately half of the space, to a third party not eligible for a tax exemption. From 1984 to 2005, HCA was given a property tax exemption for the half of the property that it uses.

In 2006, however, the City denied HCA's request for tax exemption. HCA unsuccessfully sought an abatement from the Concord Board of Assessors, and then appealed to the BTLA. *See* RSA 72:34-a (Supp. 2010). The BTLA concluded that HCA "met its burden to prove it satisfies the requirements for and is entitled to receive a charitable tax exemption for that portion of the Property it occupies pursuant to RSA 72:23, V and RSA 72:23-*l*."

During the course of the appeal before the BTLA, the City filed a motion requesting that an attorney sit as a board member. The City believed that the only attorney member of the BTLA "ha[d] been recusing himself . . . based on his residency in Concord." The City offered that if residency were the sole reason for the attorney's recusal, it would waive that cause. Otherwise, the City requested that the BTLA appoint another attorney as a temporary member to sit on cases involving the City. The BTLA denied the motion, noting that the attorney member was involved as a plaintiff in litigation against the City. The City unsuccessfully moved for reconsideration of the BTLA's decisions, and then brought this appeal.

On appeal, the City "has the burden of showing that the . . . decision is clearly unreasonable or unlawful, and all findings of the [BTLA] upon all

questions of fact shall be deemed to be prima facie lawful and reasonable." *Appeal of Kiwanis Club of Hudson*, 140 N.H. 92, 93 (1995) (quotation and ellipsis omitted); RSA 541:13 (2007); *see* RSA 71-B:12 (2003) (providing BTLA decisions may be appealed in accordance with RSA chapter 541). We will not set aside or vacate a BTLA decision "except for errors of law, unless [we are] satisfied, by a clear preponderance of the evidence before [us], that such order is unjust or unreasonable." RSA 541:13. "The interpretation of a statute is to be decided ultimately by this court. Therefore, if we find that the board misapprehended or misapplied the law, its order will be set aside." *Appeal of Town of Wolfeboro*, 152 N.H. 455, 458 (2005).

The City first challenges the BTLA's conclusion that HCA satisfies the requirements for a charitable tax exemption. We begin by reviewing those requirements. RSA 72:23, V provides that the following property is exempt from taxation:

> The buildings, lands and personal property of charitable organizations and societies organized, incorporated, or legally doing business in this state, owned, used and occupied by them directly for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established.

RSA 72:23, V. The term " 'charitable' as used to describe a corporation, society or other organization within the scope of" RSA 72:23 is defined to mean:

> a corporation, society or organization established and administered for the purpose of performing, and obligated, by its charter or otherwise, to perform some service of public good or welfare advancing the spiritual, physical, intellectual, social or economic well-being of the general public or a substantial and indefinite segment of the general public that includes residents of the state of New Hampshire, with no pecuniary profit or benefit to its officers or members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization. The fact that an organization's activities are not conducted for profit shall not in itself be sufficient to render the organization "charitable" for purposes of this chapter . . . .

RSA 72:23-*l* (2003).

In *ElderTrust of Florida, Inc. v. Town of Epsom*, 154 N.H. 693 (2007), we set forth four factors that an organization seeking a charitable tax exemption under RSA 72:23, V and RSA 72:23-*l* must satisfy; namely, whether:

(1) the institution or organization was established and is administered for a charitable purpose; (2) an obligation exists to perform the organization's stated purpose to the public rather than simply to members of the organization; (3) the land, in addition to being owned by the organization, is occupied by it and used directly for the stated charitable purposes; and (4) any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established. Under the fourth factor, the organization's officers or members may not derive any pecuniary profit or benefit.

*ElderTrust*, 154 N.H. at 697-98.

The City contends that in finding the first factor satisfied, the BTLA erred "when it decided that HCA has charitable goals but ignored how those goals are administered." The City argues that the evidence fails to support a finding that HCA operates in a manner that bestows a public benefit. For example, the City challenges the BTLA's specific finding of fact that "[t]he general public benefits through the education and training of home health care providers who are responsible for serving those who use or who may use home care services." Citing program materials contained in the record, the City argues:

The average individual in the general public providing care to a family member would not have any reason to take a seminar entitled "ICD-9 CM Coding: Update and Review" for "diagnosis coding" which is "a key element in determining accurate payments and driving outcome improvement"; "HCS-D Certification Examination"; "Introducing Financial Thinking to Clinical Minds"; "PPS Billing Bootcamp" which is a "step by step process to ensure an agency is properly reimbursed"; or "Marketing Home Care, HME and Hospice Services". These topics were obviously designed to directly assist and benefit only *agencies* in the *business* of home health care and not the needs of the general public.

(Citation and ellipsis omitted.)

As framed, the City's argument is closely related to its challenge to the BTLA's finding on the second factor, that "an obligation exists to perform the organization's stated purpose to the public rather than simply to members of the organization." *ElderTrust*, 154 N.H. at 697-98. The City contends that "[t]he [BTLA's] errors in failing to examine the administration of HCA's objects are seen more readily in light of this second factor." We accordingly address the City's arguments on both factors together, as

the arguments are interrelated and ultimately urge a single conclusion; namely, that "HCA is, *in fact*, a trade association" with its primary focus on advancing "the common interests of its members," rather than the interests of the general public.

■ "The purpose of the obligation requirement is to prevent organizations, even if they operate for charitable purposes, from obtaining the benefits of a tax exemption without providing some service of public good." *Eldertrust*, 154 N.H. at 699. The City argues that "[t]he obligation to provide services directly *to the general public* has always been the touchstone of being 'charitable.'" We disagree. In *Town of Peterborough v. MacDowell Colony*, 157 N.H. 1 (2008), we stated that the "obligatory service requirement relates not to whom the service is provided but to whether the organization is required to provide the service at all." *MacDowell*, 157 N.H. at 8. Thus, direct service to the public is not required for a charitable tax exemption. As *MacDowell* demonstrates, an organization can *indirectly* provide a benefit to the public (there, the promotion of art) by means of a service (there, the artist-in-residence program) that is provided to certain individuals (there, the Colony fellows). *See MacDowell*, 157 N.H. at 6. The obligation to provide the service by which the public benefits indirectly satisfies the requirement that the organization must be obligated to "perform [its] stated purpose to the public" and "provid[e] some service of public good." *Eldertrust*, 154 N.H. at 697, 699.

■ Nevertheless, the City's contention that HCA primarily benefits its members and "[a]ny benefit to the public is incidental to that primary purpose" must be examined. We noted in *Society of Cincinnati v. Exeter*, 92 N.H. 348 (1943), that "[a] group of persons selecting their membership and combining in self-interest for their own betterment lacks the altruistic spirit inherent in a legal charity." *Society of Cincinnati*, 92 N.H. at 356; *see Nature Conservancy v. Nelson*, 107 N.H. 316, 319 (1966) (stating taxpayer "cannot be considered a charitable organization if its purposes are confined mostly to benefiting its own members").

Here, the BTLA found that "the general public is the beneficiary of [HCA's] activities" and concluded that "[t]he fact that [HCA] provides this benefit to the public primarily through its members is not a disqualifying feature of [its] practice but rather a pragmatic approach to accomplishing its mission." The BTLA relied heavily on *MacDowell*, stating:

> The board sees [HCA's] situation as analogous to the questions raised by the Town of Peterborough and answered by the court in *MacDowell* where the town, in that case, argued the resident artists benefited from their stay at the colony rather than the general public. As the court found in *MacDowell*, the board finds

the ultimate beneficiary of [HCA's] activities is the general public. Working with and through its members, [HCA] is able, in an efficient manner, to provide home health care services to the general public.

◼ The City contends that "[t]he indirect public benefits that HCA argued it gave . . . [are] too attenuated, speculative and incidental to qualify for the charitable tax exemption." The City cites *Nature Conservancy*, 107 N.H. at 320, in which we noted that to qualify for a charitable tax exemption, the "property must be occupied and used by [the organization] for its public charitable purposes" and that "[t]his occupation and use cannot be slight, negligible or insignificant." We reached similar conclusions in other cases. For instance, in *The Housing Partnership v. Town of Rollinsford*, 141 N.H. 239 (1996), we determined that an "indefinite and prospective benefit," in the form of rent stability, "is not the direct use and occupation of the property that RSA 72:23, V requires in order for a charitable organization to receive a tax exemption." *Housing Partnership*, 141 N.H. at 244. In *Appeal of Town of Wolfeboro*, we concluded that "a theoretical future use of the charitable services available," namely, financial assistance to those residents of the taxpayer's elderly housing complex who "*might* develop the need for [such] assistance, should they enter nursing care," was insufficient to show "use and occupation [of the property] directly for the charitable purposes of the organization." *Appeal of Town of Wolfeboro*, 152 N.H. at 461.

◼◼ Although these cases dealt with the requirement that the property be "occupied . . . and used directly for the stated charitable purposes," *Eldertrust*, 154 N.H. at 698, we believe they more broadly express the principle that a tax exemption is not warranted when the asserted compliance with any of the requirements therefor is no more than "slight, negligible or insignificant," *Nature Conservancy*, 107 N.H. at 320, "indefinite and prospective," *Housing Partnership*, 141 N.H. at 244, or "theoretical," *Appeal of Town of Wolfeboro*, 152 N.H. at 461. To apply this principle in terms of the organization's charitable purpose or the provision of benefits to the public as opposed to its members, we find instructive the Massachusetts Supreme Judicial Court's statement in *Massachusetts Medical Society v. Assessors of Boston*, 164 N.E.2d 325 (Mass. 1960):

Whether an institution is in its character literary, benevolent, charitable or scientific will depend upon the declared purposes and the actual work performed. An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted

for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work.

*Massachusetts Medical Soc.*, 164 N.E.2d at 328 (citations omitted); *cf. Society of Cincinnati*, 92 N.H. at 356 ("If there may be additions in broadening the definition of a charitable institution that it is one dispensing public charity as its sole or primary engagement, the Society does not qualify.").

■ Accordingly, we conclude that for an institution or organization to meet the requirement that it was "established and is administered for a charitable purpose," *ElderTrust*, 154 N.H. at 697, that charitable mission must be its dominant or primary purpose; if the dominant or primary "purpose of its work is to benefit its members or a limited class of persons," the organization will not meet this requirement "even though the public will derive an incidental benefit from such work." *Massachusetts Medical Soc.*, 164 N.E.2d at 328. As with the obligation requirement, to determine whether an organization meets the "established and . . . administered" requirement, *ElderTrust*, 154 N.H. at 697, we "look to both its charter or organizational statements and its actions taken pursuant to those statements." *E. Coast Conf. of the Evangelical Covenant Church of America v. Town of Swanzey*, 146 N.H. 658, 662 (2001); *see Massachusetts Medical Soc.*, 164 N.E.2d at 328 ("Whether an institution is in its character literary, benevolent, charitable or scientific will depend upon the declared purposes and the actual work performed."). Thus, notwithstanding that an organization's stated purpose is to primarily benefit the public, if the organization is actually administered so that any public benefit is "slight, negligible or insignificant," *Nature Conservancy*, 107 N.H. at 320, when compared to the benefit derived by the organization's members, the organization is not entitled to a charitable tax exemption. We note that the principles we enunciate herein are entirely consistent with *MacDowell*, in which we agreed with the trial court's conclusion that MacDowell's artist-in-residence program did, in fact, "*primarily* benefit[] society as a whole." *MacDowell*, 157 N.H. at 6 (quotation omitted; emphasis added).

■ Here the BTLA denied the City's proposed factual finding that "HCA's corporate purpose is to promote the common interests of its members who are involved in the home health care industry." The BTLA acknowledged that HCA's activities "benefit [its] members directly," but found that the general public is "the ultimate beneficiary of [HCA's] activities." Specifically, the BTLA found that HCA's services benefit the

general public: (1) "through the education and training of home health care providers who are responsible for serving those who use or who may use home care services"; (2) "from the promotion of programs and services directed toward the prevention of illness, the encouragement of good health practices and the overall protection of the public's health"; and (3) "from increased effectiveness and availability of human services." We accept these findings as *prima facie* lawful. *See Appeal of Kiwanis Club*, 140 N.H. at 93; RSA 541:13. The BTLA did not determine, however, whether these benefits are merely incidental to a dominant or primary purpose (as opposed to the sole purpose as intimated in the rejected finding of fact) of benefiting HCA's members, or whether these benefits to the public are slight, negligible or insignificant when compared to the benefit derived by HCA's members. Nor did it determine, more specifically, whether HCA is, in fact, in the manner in which it is operated, more akin to a trade or professional association. *See Massachusetts Medical Soc.*, 164 N.E.2d at 328. Accordingly, we vacate the BTLA's decision and remand for further proceedings consistent with this opinion.

The City next argues that the BTLA erred in failing to find that GSHAA is not a charitable organization, having disposed of the City's request for that finding by neither granting nor denying it. The City argued before the BTLA that "HCA and GSHHA are, for all intents and purposes, one and the same organization for purposes of analyzing the use of the real estate." The BTLA noted, however, that it could find no support in New Hampshire law for "the City's premise that GSHHA's lobbying efforts overshadowed or negatively impacted" HCA's mission and thereby disqualified HCA for a tax exemption.

■ The City changes tack somewhat on appeal, asserting that "GSHHA is in fact a separate corporation," and arguing that it was erroneous for the BTLA "to ignore its use and occupancy of the real estate." We agree that GSHHA's use and occupancy of the property is relevant to determining the extent, if any, to which HCA is entitled to a tax exemption for the property. If GSHHA uses the property for non-exempt purposes, "[a] division of value between the two uses should be made if such exist." *Alton Bay Camp Meeting Asso. v. Alton*, 109 N.H. 44, 50 (1968).

■ We need not determine whether, as HCA contends, the City failed to develop before the BTLA its argument based upon RSA 72:23, V-a. That statute is not necessary to the City's argument, as it deals with the converse proposition: that real estate owned but not occupied by an organization eligible for an RSA 72:23 tax exemption may still be exempt if the occupying organization is also eligible for the exemption. *See* RSA 72:23, V-a. Here, the issue is use of the property by an organization (GSHHA) that

the City claims is not eligible for a charitable tax exemption. The BTLA had before it evidence of GSHHA's activities and use of the property. Accordingly, on remand, the BTLA should examine whether any allocation of exempt and non-exempt use must be made in accordance with *Alton Bay Camp Meeting Asso.*, 109 N.H. at 50.

Finally, the City challenges the BTLA's denial of its motion to have an attorney sit as a board member. The City states:

> [T]he City does not challenge the Board's decision as to [the attorney member's] recusal so long as he is personally involved in litigation against the City. However, as the recusal has continued for many years (even to date), the City and its taxpayers have been — and will continue to be — denied the opportunity to have all skills and resources available for appeals that were intended by the legislature.

HCA argues that the City has not shown that the BTLA's order was clearly unreasonable or unlawful, particularly where the City does not challenge the recusal in this case but "[i]nstead . . . appears to focus on perceived continued or future unfairness." We agree, and decline to address the City's broader challenge because the issue as raised is not ripe for review.

In part, "ripeness relates to the degree to which the defined issues in a case are based on actual facts and are capable of being adjudicated on an adequately developed record." *Appeal of State Employees' Assoc.*, 142 N.H. 874, 878 (1998) (quotation, brackets and ellipsis omitted). As HCA notes, even if the City's allegations of a recusal policy that has continued for many years and will continue are true, such facts are simply not in the record before this court. Accordingly, we decline to address the City's claim.

*Vacated and remanded.*

DALIANIS, C.J., and DUGGAN and CONBOY, JJ., concurred.