Rockingham
No. 88-146

CHERYL A. BROWN, PERSONALLY AND AS ADMINISTRATRIX

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE CO., TRUSTEE

March 6, 1989

*Brown & LaPointe*, of Exeter (*Page Brown* on the brief, and *Scott LaPointe* orally), for the plaintiff, Cheryl A. Brown, personally and as administratrix of the Estate of Fred M. Brown.

*Burns, Bryant, Hinchey, Cox & Shea P.A.*, of Dover, (*Christine M. Rockefeller* on the brief and orally), for the defendant, John Hancock Mutual Life Insurance Company, Trustee of the Group Protection Insurance Trust.

SOUTER, J.   The defendant appeals from an order of the Superior Court (*Charles T. Gallagher*, Esq., Master; *Gray*, J.), granting summary judgment for the plaintiff in this action for the proceeds of a group life insurance policy. The issues presented are whether the trial court overstepped its authority on motion for summary judgment by resolving a factual dispute in finding that the insured decedent had not been informed of a policy exclusion for death

caused while racing an automobile, and whether the defendant was entitled to summary judgment based on the decedent's failure to make advance payment of contribution. We hold that the disputed conclusion was an impermissible resolution of a genuine issue of material fact, when viewed in light of the record developed on motion for reconsideration, and we both reverse and order judgment for the defendant because there was no dispute that under the terms of the policy coverage had expired for non-payment.

In 1985 the decedent applied for group life coverage from Group Protection Insurance Trust (the trust), the trustee and carrier for which was the defendant, John Hancock Mutual Life Insurance Company. It is undisputed that the trust accepted the application as of July 1, 1985, as indicated in a letter to the decedent dated June 6, 1985, which stated that "[t]o further explain all the details of your plan we are enclosing: Your personalized Certificate. A copy of your Application. Administration Instructions."

It is likewise undisputed that the certificate provided *inter alia* that the "[p]olicy is the contract of insurance between the Policyholder and the John Hancock [which] controls all the terms and conditions of your insurance [, none of which is] waived by anything set forth herein," although there was conflicting evidence on whether the certificate delivered to the decedent expressly referred to or contained the text of any exclusion. It is, in any case, undisputed that the Administration Instructions addressed the subject of "Payment of Contribution," by stating that payments could be "made on a quarterly, semi-annual, or annual basis." The document proceeded to explain that "[i]nsurance will terminate on the last day of the period for which a contribution was made," and this language was followed by a provision that "[i]f . . . coverage ends because of non-payment of contribution, coverage can be reinstated provided payment is received within 30 days of the due date."

With his application the decedent enclosed payment for one month, and he thereafter received a bill for the balance of the first quarter ending September 30, which he paid. It is undisputed that he paid nothing more and was killed while racing a car on October 27, 1985.

When the plaintiff claimed the proceeds of the policy, the trust responded that coverage had lapsed for non-payment of contribution and also invoked an exclusion for death caused while the decedent was riding in an "automobile in any race. . . ." After bringing action for the policy proceeds, the plaintiff moved for

summary judgment under RSA 491:8-a and submitted her own affidavit, stating that she had reviewed the information sent by the trust in response to the application for insurance, and that she and the decedent had reached an "understanding that in the event [the decedent] was to die as a result of a motor vehicle accident at a race track, [the plaintiff] would collect on [the decedent's] life insurance."

The defendant objected and moved for summary judgment on its own behalf. In the body of the motion itself, defendant's counsel relied on the provisions for termination for non-payment, quoted above, and claimed on the basis of the plaintiff's answers to interrogatories that she denied neither the decedent's receipt of those provisions nor his failure to contribute for coverage beyond the quarter ending September 30, 1985. Alternatively, the defendant cited the exclusion for death caused while racing. Although the defendant conceded that the plaintiff denied the decedent had ever received actual notice of this exclusion, it argued that the dispute was irrelevant in light of the controlling character of the master policy, which was said to contain the racing exclusion. Attached to the defendant's motion was an affidavit of one of its employees, who stated on oath that a letter, personalized certificate and administration instructions had been sent to the decedent upon his enrollment in the group plan, and swore that the decedent had made no contribution for the period after the first quarter of coverage. The defendant also submitted the plaintiff's answers to interrogatories, a certificate indicating the decedent had died while racing, copies of cancelled checks showing payment of the first quarter contribution, and what purported to be copies of the materials sent to the decedent at the time of his enrollment. These documents made no mention of a racing exclusion, but they did refer to the master policy as controlling and did contain the terms limiting coverage to the period for which contributions had been made in advance, subject to a right of reinstatement for payment made within thirty days of the time it was due. At a hearing on the parties' motions, the master may have permitted the introduction of or reference to further evidence, although no record was made, and if exhibits were introduced, they were not transferred to this court on appeal.

While the master called the defendant's position "impregnable if the terms of the policy alone are considered," he implicitly ruled that the policy was not controlling. With respect to the alleged racing exclusion, he found there was "no mention of a race track exclusion in any of the literature sent to [the decedent]," and

ultimately recommended summary judgment in the plaintiff's favor. As for the requirement of payment in advance, the master apparently accepted the defendant's position that there was no dispute about the decedent's failure to make any contribution for the period after September 30, 1985, with the result that there was no coverage after that date under the terms communicated to the decedent. The master nonetheless proposed a ruling that RSA 408:16, I, required coverage through the date of death, by mandating a grace period of thirty-one days.

The court's adoption of the master's recommendation in the plaintiff's favor provoked a new round of pleadings. The defendant led off with a motion to reconsider, limited to the issue of the racing exclusion. It referred to material previously submitted, which supposedly demonstrated a factual dispute as to whether the trust had communicated the terms of such an exclusion to the decedent, and demanded a trial on that issue. The motion then proceeded to reiterate the claim that the master policy must in any event be given controlling effect, from which we infer that the defendant may not have introduced the relevant terms of the master policy into evidence (in which case the defendant, if correct about the policy's content, could have argued for summary judgment based on the policy without any need for a trial).

To the plaintiff's ensuing objection she attached all of the materials previously submitted by the trust, plus a further document, which, on the record before us, thus surfaced for the first time. It was an expanded version of the so-called personalized certificate, comprising eleven pages purporting to state at least some of the master policy's terms, among which was the racing exclusion. The plaintiff explained that the defendant had supplied this document in response to the plaintiff's interrogatory requesting copies of materials supplied by the trust to the decedent. By placing the document before the court, the plaintiff demonstrated that there was indeed a factual disagreement as to whether the trust had actually communicated a racing exclusion to the decedent, just as the defendant had been contending. (The master may have been less surprised by this new certificate than we were, since at oral argument before us defendant's counsel stated that the new version had been brought to the master's attention at the hearing. As noted above, however, there is no record of the hearing that might support this claim.) Despite this demonstration against her own position, the plaintiff argued that reconsideration should be denied. When it was, this appeal followed.

As the first paragraph of our opinion reveals, we could dispose of the case by going directly to the issue of termination of coverage for failure to pay contributions. Because, however, the record before us presents a cautionary tale about the consequences of loose practice on summary judgment, we will take a moment to consider the pleadings as they bear on the defendant's first assignment of error, that the trial court impermissibly resolved a factual dispute that should have precluded the award of summary judgment to the plaintiff. We have to approach this issue from the most basic level.

■■■ The justification for summary judgment, and the object of the statutory requirements for resort to that process, is the expeditious ending of litigation when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RSA 491:8-a, III; *Salitan v. Tinkham*, 103 N.H. 100, 102, 166 A.2d 115, 117 (1960). Any party seeking summary judgment must support the request with "an affidavit based upon personal knowledge of admissible facts as to which it appears affirmatively that the affiants (sic) will be competent to testify," RSA 491:8-a, II; and on the evidentiary basis supplied by one or more of such affidavits, together with discovery material presented to the court, the movant must rest a claim of legal entitlement to judgment, RSA 491:8-a, III. *Salitan v. Tinkham, supra* at 103, 166 A.2d at 117.

■■ Even this simplified statement of a moving party's burden is sufficient to explain why the plaintiff's motion for summary judgment, as originally filed, entitled her to no relief. Although the motion itself was replete with allegations, an unsworn motion is not an affidavit. The motion can do no more than articulate the relevant factual claims that must then be supported by affidavit, deposition, answer to interrogatory or like discovery material. The affidavit filed with the plaintiff's motion was wholly inadequate for this purpose, for it did no more than state the plaintiff's "understanding," gained from reading literature sent to the decedent, that his death while racing would entitle her to collect under the group policy. As a matter of insurance law, there is no need to cite authority that an "understanding" does not alone create coverage or negate the existence of exclusions. As a matter of summary judgment law, it is axiomatic that affidavits and other material predicating summary judgment must state or indicate specific facts, which, if not genuinely disputed, entitle the moving party to judgment. *See Salitan v. Tinkham, supra* at 103, 166 A.2d at 117. Statements of legal conclusions will not do. *Salitan, supra* at 103,

166 A.2d at 118. Nor, *a fortiori*, will such an expression of purely personal opinion as the statement of understanding that lay at the heart of the plaintiff's affidavit in this case.

■ There is always, of course, a possibility that a party opposing summary judgment may unwittingly supply what the moving party requires but has failed to provide, since summary judgment is to be granted or denied based on the entire record before the court. *See* RSA 491:8-a, III; 6 MOORE, FEDERAL PRACTICE ¶ 56.15[3], at 56–265 (movant entitled to benefit from any support supplied by papers filed by opponent); *Chan Wing Cheung v. Hamilton*, 298 F.2d 459 (1st Cir. 1962). And if, indeed, this case turned finally on the genuineness of a dispute about the existence of a racing exclusion, the defendant's response could be seen as helping the plaintiff in just such a way.

As we noted above, the defendant's responsive pleading on the issue of the racing exclusion alleged that the certificate sent to the decedent contained the exclusion, although the defendant conceded that the plaintiff claimed otherwise. The pleading added that even if the ultimate factual determination on this point should turn out to be favorable to the plaintiff, the defendant would still be entitled to prevail because the master policy contained the exclusion, and the master policy governed (thus invoking the rule in *Fisher v. Prudential Insurance Co.*, 107 N.H. 101, 104, 218 A.2d 62, 65 (1966)). Surprisingly, however, the copy of the certificate submitted by the defendant contained no statement of a racing exclusion and therefore lent no support to the defendant's claim that the policy excluded coverage for death resulting from auto racing and that the decedent had been so informed. Although the certificate did refer to the master policy as governing coverage, neither the policy nor any selection from it was attached, and the failure to submit any policy terms could reasonably have been taken to indicate that the defendant did not genuinely claim that the master policy contained a racing exclusion.

The defendant's exhibits, in other words, supported the position espoused by the plaintiff on the issue of the racing exclusion, and at that point the master was entitled to conclude that the dispute about the existence of a racing exclusion was not genuine and that the materials sent to the decedent contained no terms that would have defeated coverage for a racing death. We have no doubt that the master meant to refer to these conclusions when he stated that the literature sent to the decedent failed to mention the exclusion, and if nothing more had been presented the master would have been correct on the issue of the racing exclusion, on which the

defendant would have engineered its own defeat. More was presented, however.

It is possible, to begin with, that the policy had at least been shown to the master at some point, since the master's report spoke of the policy as excluding coverage for accidents at race tracks. If in fact the master had been shown the policy terms, he should have made this clear on the record and have proceeded to deal with the significance of those terms under *Fisher supra.*

More importantly, it is clear on the record that after the court ruled in the plaintiff's favor, the defendant responded, as we have seen, with a motion for reconsideration, explaining once again that it desired a trial on the issue of the racing exclusion. Although the plaintiff was under no obligation to make any response to the motion for reconsideration, *see* SUPER. CT. R. 59-A(2) (no answer to motion for reconsideration required unless ordered by court), she chose to do so, and when she also submitted the new version of the certificate that included a racing exclusion, she furnished support for the defendant's position. (We do not suggest that the plaintiff was ethically free to file the optional response and at the same time to ignore the version of the certificate containing the racing exclusion, which she had obtained through discovery and which supported the defendant's position that a genuine issue existed. No issue was raised, and nothing is decided, about the plaintiff's obligation to apprise the court of evidence that the defendant produced for the plaintiff on discovery but inexplicably failed to produce for the court in support of its motion for summary judgment.)

■ To summarize the state of the record at this point, insofar as the racing exclusion was concerned, the plaintiff's inadequate motion for summary judgment had been rescued by defense exhibits consistent with the plaintiff's position, only to be followed by further pleading from the plaintiff, accompanied by an exhibit that countered the plaintiff's own argument and supported the defendant. The master was reasonably entitled to feel confused at that point. He was also entitled to exercise discretion in deciding whether to receive the evidence submitted with the plaintiff's response to the request for reconsideration, for although Superior Court Rule 59-A entitles a party who has received an adverse ruling on a motion to seek reconsideration, the rule does not purport to authorize either party to submit further evidence bearing on the motion. The master was therefore free under Rule 59-A to reject the plaintiff's new exhibit, and if he had done so it would not have been error to deny reconsideration. There is, however, no indication

on the record that the master took this course, and we have to assume that he considered everything the parties had submitted on the record.

Once the plaintiff's last pleading and exhibit were considered, the latter could have been read as supporting the defendant's claim that it sent a certificate with a racing exclusion, and as indicating a genuine dispute on this point. It was then no longer open to the master to infer either that no such certificate had been sent or that there was no genuine dispute about whether it had been sent; the plaintiff had turned the tables on herself. Insofar as the prior order for summary judgment assumed there was no genuine dispute about a racing exclusion, therefore, the master was obliged to recommend that it be vacated, and if the case had turned on the racing exclusion, the court would have had no choice but to set the case down for trial. The case did not, however, turn on the exclusion, and we will end this consideration of the pleading it provoked by stressing the obligation of counsel to bring skill and care to the conduct of summary judgment practice.

The point on which the case does turn was raised as an alternative ground for relief in the defendant's motion for summary judgment in its own behalf, that coverage ended on September 30, 1985, in accordance with the terms of the certificate and the underlying policy, when the decedent failed to make any contribution for coverage beyond that date. On this claim there was, indeed, no issue of fact whatsoever. The defendant had submitted, as an attachment to the affidavit filed with its own motion, a copy of "Administration Instructions" that conditioned coverage on prepayment of contribution and thus ruled out any grace period. The plaintiff did not dispute that the trust had communicated such terms to the decedent, and she conceded the non-payment. The plaintiff's position on this point rested not on the policy but on the State's statutory law, which she claimed had given the decedent a grace period for payment, during which coverage continued and the decedent died.

The trial court accepted the plaintiff's position, on the authority of RSA 408:16, I, which requires all group life policies to contain a provision "that the policyholder is entitled to a grace period of 31 days for the payment of any premium due except the first, during which grace period the death benefit coverage shall continue in force . . .," subject to exceptions not here relevant. We hold, however, that the trial court's application of this language to excuse the decedent's failure to pay for coverage beyond September 30 was error, resting on a misreading of the statutory terms.

Although RSA chapter 408 contains no formal definitions of the terms it uses to regulate the provision of group life insurance, the statutory usage is clear. Standing between the ultimate insurer and the insured individual is a third or middle party to whom the insurer issues a policy providing coverage for such members of an eligible class as may thereafter be enrolled. *See generally* RSA 408:15. In this tripartite relationship, the third or middle party to whom the insurer issues the policy is statutorily labelled as the "policyholder," *see id.* I–VII; *Ford v. United Life &c. Ins. Co.*, 107 N.H. 114, 218 A.2d 67 (1966), as distinguished from the person insured, who receives not a written policy, but an individual certificate attesting to the insurance provided. *See* RSA 408:16, VI, VII; *Fisher v. Prudential Insurance Co.*, 107 N.H. at 103, 218 A.2d at 65. Following common terminology, the policyholder pays a premium to the insurer, whereas the insured pays what the statutes usually refer to as a contribution, *see* RSA 408:15, I(b), III(b), IV(b), VI(b), but which they sometimes speak of as a charge, *see* RSA 408:15, II(b), VII(b). *But see* RSA 408:16-b (employee group members may pay "premiums" directly to policyholder during strikes).

▪▪▪ Applying this statutory terminology to the parties involved in this case, John Hancock is the insurer, the policyholder is the trust (whose trustee is also John Hancock), and the insured was the decedent. When, therefore, RSA 408:16, I, in effect provided a group policyholder with a 31-day grace period for the payment of a premium, it mitigated the obligation that the trust as policyholder would otherwise have owed to John Hancock as the insurer, but it did not in any way relax the obligation of the insured to make timely contributions to the trust in accordance with the payment schedule established between the trust and the insured. Thus, it was a mistake to rule that RSA 408:16, I, excused the decedent's admitted failure to pay with respect to the period after September 30, 1985, when coverage ended under the term as expressed in the "Administration Instructions" that insurance terminates for "Non-Payment of Contribution . . . on the last day of the period for which a contribution was made." The defendant was therefore entitled to summary judgment as a matter of law, which will now be entered.

*Reversed.*

All concurred.