Merrimack
No. 2012-436

GRANITE STATE MANAGEMENT & RESOURCES

v.

CITY OF CONCORD

Argued: April 11, 2013
Opinion Issued: August 21, 2013

278

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Margaret H. Nelson* on the brief and orally), for the petitioner.

*City Solicitor's Office*, of Concord (*James W. Kennedy* and *Danielle L. Pacik* on the brief, and *Mr. Kennedy* orally), for the respondent.

LYNN, J. The respondent, City of Concord (City), appeals an order of the Superior Court (*McNamara*, J.) granting summary judgment to the petitioner, Granite State Management & Resources (GSMR), and denying summary judgment to the City, based upon a finding that GSMR is a charitable organization eligible for a tax exemption under RSA 72:23, V (2012) for the tax years 2008 and 2009. We affirm in part, reverse in part, and remand.

*I. Facts*

The summary judgment record supports the following facts. GSMR is a New Hampshire nonprofit corporation that is exempt from federal income tax under 26 U.S.C. § 501(c)(3). Article 2 of its Articles of Agreement (articles) sets forth GSMR's purpose as:

> providing low cost or alternative financial assistance to eligible students and to parents, custodians or guardians of such students who are attending educational institutions or participating in educational programs in the United States of America and its territories . . . *and of supporting the development of higher education and educational opportunities* for the citizens of the United States of America and its territories.

(Emphasis added.)

According to its chief financial officer (CFO), Dean Grondin, GSMR has two primary functions: student loan servicing and staffing. First, GSMR contracts with its nonprofit affiliate, New Hampshire Higher Education Loan Corporation (NHHELCO), to service loans originated under the Federal Family Education Loan Programs (FFELP), a federally guaranteed student and parent educational loan program. NHHELCO is a nonprofit organization that is also exempt from federal income tax under 26 U.S.C. § 501(c)(3); it is a qualified lender under FFELP and supplements FFELP loans when they provide insufficient funding. *See* 20 U.S.C. § 1078. GSMR services education loans for several lenders in addition to NHHELCO, including private organizations.

Second, GSMR provides "all administrative and management services and all staff necessary to enable" NHHELCO and two other nonprofit affiliates of GSMR "to carry out their charitable and education[al] purposes." Together with NHHELCO, these nonprofit affiliates — the New Hampshire Higher Educational Assistance Foundation (NHHEAF) and NHHEAF Network Educational Foundation (NNEF) — comprise the so-called NHHEAF Network. NHHEAF is a nonprofit organization exempt from federal income tax under 26 U.S.C. § 501(c)(3) that serves as an in-state guarantor of loans originated under the federal guaranteed student and parent educational loan programs. NNEF was a tax-exempt charitable trust that suspended operations in 2008 and transferred its assets to NHHELCO. But for the staffing services provided by GSMR, the NHHEAF Network organizations do not have any employees.

The trial court found that "there can be no serious dispute that the fundamental purpose of GSMR is to service educational loans" and that its only assets "likely to generate income are the loan servicing assets." GSMR

derives income from origination fees paid by borrowers, loan servicing and origination fees paid by institutions, and interest stemming from the education loans that GSMR administers. It uses its income to "pay operational expenses, to pay for uncollectible loans and collection expenses, to fund loan default reserves, to provide student[s], parent[s], and institution[s] information and counseling, . . . to pay for the development of new educational loan related activities and services," and to conduct "statewide outreach efforts." In 2008 and 2009, GSMR serviced approximately $2.5 billion in loans, earned a substantial net profit, maintained investments, and retained a surplus.

According to GSMR, as a result of its activities in 2008 and 2009, "New Hampshire students and parents were able to obtain access to lower cost funds to finance the cost of education," "New Hampshire educational institutions were assured of the flow of funds necessary to allow them to continue their educational activities," and "New Hampshire lenders were provided with a convenient means to provide families with educational financing."

## II. Procedural Background

GSMR owns four parcels of land located at 1-4 Barrell Court in Concord. Lots 17 and 20 are used for parking. Office buildings are located on Lots 18 and 19, which were consolidated in 2001.

In 2008, the City assessed taxes on Lots 17 and 20 based on their full value. Although Lot 17 was subject to a payment-in-lieu-of-taxes (PILOT) agreement entered into by the City and GSMR in February 2001 (February 2001 PILOT), the City informed GSMR in 2003 that the PILOT had expired, and began taxing Lot 17 at its full value. The City taxed consolidated Lots 18 and 19 pursuant to a separate PILOT agreement entered into in September 2000 (September 2000 PILOT). Although the September 2000 PILOT applied solely to Lot 18, in 2003 the City started using the combined value of Lots 18 and 19 when appraising the consolidated lot for PILOT purposes. In 2008, the City assessed taxes on consolidated Lots 18 and 19 under the September 2000 PILOT using the lots' combined value. GSMR paid the assessed taxes on all four lots, but informed the City that it believed the tax bill "include[d] a substantial overpayment." GSMR subsequently brought a petition for declaratory judgment.

In 2009, the City determined that GSMR did not qualify for the charitable tax exemption because it did not meet the statutory definition of "charitable." See RSA 72:23, V, :23-l (2012). After applying, unsuccessfully, for a full abatement of its 2009 taxes, GSMR filed a second petition for declaratory judgment.

The trial court consolidated GSMR's petitions, and the parties filed cross-motions for summary judgment. GSMR argued that it "fully meets the standards for a charitable exemption under RSA 72:23, V and that the City's decision in 2009 to . . . [deny] GSMR such a tax exemption was incorrect." As regards 2008, GSMR contended that the City improperly taxed: (1) Lot 17 at its full rate, even though it was subject to the February 2001 PILOT; and (2) Lot 19 under the terms of the September 2000 PILOT, which was applicable only to Lot 18. The City argued in its motion for summary judgment that GSMR was not eligible for a charitable tax exemption under RSA 72:23, V for 2008 and 2009 because it is not a charitable organization.

The trial court granted GSMR's motion for summary judgment and denied the City's motion. Addressing GSMR's tax liability for consolidated Lots 18 and 19, the court found that the lots were subject to the September 2000 PILOT and that it was "appropriate for the City to use the consolidated lot when valuing the parcel subject to the PILOT for billing purposes." The court also agreed with the City that in 2004, Lot 17 ceased to be subject to the February 2001 PILOT. Nevertheless, it concluded that Lots 17 and 20 were exempt from taxation because GSMR was "a charitable organization entitled to a tax exemption" and it used the lots "for parking for the facilities for which GSMR is entitled to an exemption." The court's determination that Lots 17 and 20 are tax-exempt apparently applied both to 2008 and 2009, given its findings that GSMR was a charitable organization during these years and that the February 2001 PILOT had previously terminated. It is not clear from the record, however, whether the trial court's determination that consolidated Lots 18 and 19 were subject to the September 2000 PILOT pertains solely to 2008 or to 2009 as well, *i.e.*, whether the September 2000 PILOT was terminated prior to 2009. The City appealed.

*III. Standard of Review*

In reviewing the trial court's rulings on cross-motions for summary judgment, "we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." *N.H. Assoc. of Counties v. State of N.H.*, 158 N.H. 284, 287-88 (2009) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.*, 160 N.H. 690, 692 (2010) (quotation omitted); *see* RSA 491:8-a (2010).

## IV. Charitable Exemption

RSA 72:23, V exempts from taxation:

> [t]he buildings, lands and personal property of charitable organizations and societies organized, incorporated, or legally doing business in this state, owned, used and occupied by them directly for the purposes for which they are established, provided that none of the income or profits thereof is used for any other purpose than the purpose for which they are established.

Pursuant to RSA 72:23-*l*:

> The term "charitable" . . . shall mean a corporation, society or organization established and administered for the purpose of performing, and obligated, by its charter or otherwise, to perform some service of public good or welfare advancing the spiritual, physical, intellectual, social or economic well-being of the general public or a substantial and indefinite segment of the general public that includes residents of the state of New Hampshire, with no pecuniary profit or benefit to its officers or members, or any restrictions which confine its benefits or services to such officers or members, or those of any related organization.

■ In *ElderTrust of Florida v. Town of Epsom*, 154 N.H. 693 (2007), we held:

> [T]he plain language of RSA 72:23, V and RSA 72:23-*l* requires the institution [applying for a charitable tax exemption] to satisfy each of the following four factors; namely, whether: (1) the institution or organization was established and is administered for a charitable purpose; (2) an obligation exists to perform the organization's stated purpose to the public rather than simply to members of the organization; (3) the land, in addition to being owned by the organization, is occupied by it and used directly for the stated charitable purposes; and (4) any of the organization's income or profits are used for any purpose other than the purpose for which the organization was established. Under the fourth factor, the organization's officers or members may not derive any pecuniary profit or benefit.

*ElderTrust*, 154 N.H. at 697-98.

### A. The City's Motion for Summary Judgment

On appeal, the City argues that GSMR cannot satisfy any of the four *ElderTrust* factors. The City argues that GMSR is not administered for a

charitable purpose, lacks an enforceable obligation to perform a charitable purpose, does not use its land for a charitable purpose, and benefits its officers rather than the public. *See id.* The main thrust of the City's argument is that GSMR's activity of "administer[ing] and servic[ing] student loans for both non-profit entities and for-profit entities, earning a significant profit" does not qualify it as a charitable organization. We address each *ElderTrust* factor in turn.

First, in order to qualify for a charitable tax exemption under RSA 72:23, V, an organization must be established and administered for a charitable purpose. *Id.* at 697. Generally, charitable purposes fall into the following categories: (1) relieving poverty; (2) promoting health; (3) advancing education; (4) aiding religion; (5) providing governmental or municipal facilities and services; and (6) other purposes that are beneficial to the community. *Town of Peterborough v. MacDowell Colony*, 157 N.H. 1, 12 (2008) (Dalianis, J., concurring). "[T]he legislative purpose to encourage charitable institutions is not to be thwarted by a strained, over-technical and unnecessary construction [of RSA 72:23, V and RSA 72:23-*l*]." *Id.* at 5 (quotation omitted).

The trial court found that GSMR serves a charitable purpose because it "benefit[s] . . . the public at large by providing highly efficient streamlined loan services to New Hampshire lenders," and that its "key benefit is its efficiency."[1] The court found that "GSMR's activities help reduce fees and expenses paid by banks that own student loan debt that GSMR services," which, in turn, makes lending and borrowing, respectively, "less expensive for the originators of student loans and consequently for students themselves." The court further found that, were a for-profit organization to service the loans instead of GSMR, "that cost would be passed on to the users of student loans; the very individuals GSMR seeks to assist by providing low-cost, efficient loan services." This outcome, the court found, would frustrate the public benefit of "minimizing the costs of servicing student loans so that the loans become more affordable for students to undertake."

The City argues that efficiently managing and servicing student loans does not constitute a charitable purpose. We decline to view GSMR's charitable purpose so narrowly. According to its articles, GSMR serves the purpose of "providing low cost or alternative financial assistance to eligible students and to parents . . . and of supporting the development of higher

---

[1] To the extent that the trial court relied on GSMR's community outreach activities in finding that GSMR provided the public benefit of efficiency, the record does not offer factual support for or establish a connection between outreach activity and efficient loan servicing.

education and educational opportunities." Efficient servicing and administration of loans is not GSMR's charitable purpose, but a means to achieve that purpose. *Cf. Burris v. Tower Hill School Ass'n*, 179 A. 397, 399 (Del. Super. Ct. 1935) ("[W]here the dominant consideration in acquiring a residence for a school employee is to promote the efficient administration of the institution rather than to furnish a habitation for the employee, the residence is considered as being used for educational purposes."). If GSMR's activities do, indeed, reduce the cost of obtaining educational loans for students, they clearly promote the advancement of education. Treating efficiency separately from the recognized charitable purpose of advancing education would result in the type of "strained, over-technical and unnecessary construction" of RSA 72:23-*l* that is inconsistent with the legislative purpose of encouraging charitable institutions. *MacDowell Colony*, 157 N.H. at 5.

The City argues that GSMR is not administered for a charitable purpose because it does not originate or service loans of its own, but instead manages and services loans originated and guaranteed by NHHEAF, NHHELCO, and other lenders. The City contends that, "[e]ven if NHHEAF and NHHELCO were deemed charitable, GSMR is not permitted to 'bootstrap' or 'piggy-back' on the charitable activities of another organization to demonstrate that it qualifies as a charity, even if it makes those organizations more efficient." We disagree.

■ ■ Making another organization's activity more efficient does not disqualify an organization from a charitable tax exemption: a charitable organization may benefit the public indirectly.

> [D]irect service to the public is not required for a charitable tax exemption. . . . [A]n organization can *indirectly* provide a benefit to the public . . . by means of a service . . . that is provided to certain individuals . . . . The obligation to provide the service by which the public benefits indirectly satisfies the requirement that the organization must be obligated to perform its stated purpose to the public and provide some service of public good.

*Appeal of City of Concord*, 161 N.H. 344, 350 (2011) (citation, quotations, and brackets omitted). In *Appeal of City of Concord*, we affirmed the finding of the New Hampshire Board of Tax and Land Appeals (BTLA) that the taxpayer organization could ultimately benefit the public by training and otherwise supporting home health care providers.[2] *Id.* at 350, 352-53.

---

[2] Our remand on this point in *Appeal of City of Concord* was for the purpose of having the BTLA determine whether the taxpayer's "benefits to the public are slight, negligible or insignificant when compared to the benefit derived by [the taxpayer's] members." *Appeal of City of Concord*, 161 N.H. at 353.

Similarly, in *MacDowell Colony*, we concluded that a highly selective residential "program restricted to artists . . . of the highest talent" benefited the general public and furthered the charitable purpose of promoting the arts. *MacDowell Colony*, 157 N.H. at 7-9 (rejecting the town's contention that the taxpayer "cannot ride upon the coattails of the individual artists to receive a public charitable tax exemption" where the taxpayer's "charitable purpose is not to actually create art but to promote it"). Based on our case law, we disagree with the City that GSMR must engage in direct lending in order to be eligible for a charitable tax exemption.

The authority that the City cites in support of its argument that GSMR does not perform a charitable purpose because it "piggy-backs" on the lenders' charitable activities is neither controlling nor persuasive. The City relies on two Pennsylvania cases — *Lewistown Hospital v. Mifflin County Board*, 706 A.2d 1269 (Pa. Commw. Ct. 1998), and *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa. Commw. Ct. 1996) — and on an opinion of the BTLA, *Shallow River Properties, Inc. v. Town of Northumberland*, 2001 WL 345141 (N.H. Bd. Tax. Land. App., Feb. 5, 2001).

In *Sacred Heart Healthcare System*, the Commonwealth Court of Pennsylvania denied a charitable tax exemption to a corporation, Sacred Heart Healthcare System (SHHS), in part because the direct beneficiaries of its services were its affiliated organizations rather than the public. *Sacred Heart Healthcare System*, 673 A.2d at 1026. SHHS's articles of incorporation described its charitable purpose as

> benefitting, supporting, and performing functions of Sacred Heart Hospital . . . and other subordinate units of the Corporation . . . [and] such support will enable such organizations to improve the quality, breath [*sic*] and diversity of health care delivered to the public in Lehigh County . . . ; and to contain consumer and governmental costs of such health care, through more efficient utilization all [*sic*] allocation of health care resources . . .

*Id.* Consistent with this purpose, "SHHS provide[d] administrative and management services to only a small group of affiliated corporations, both for-profit and non-profit, for a fee, and *not* to the general public or any segment of the general public." *Id.* The court reasoned that, even though SHHS aimed to "improve[e] the efficient allocation of health care resources," it did not advance a charitable purpose because "[m]anagement and administrative services cannot be classified as educational, religious,

moral, physical, or social, and are, thus, not charitable" and "because the direct beneficiaries of SHHS' services are its affiliated organizations" rather than the public. *Id.*

Similarly, in *Shallow River Properties, Inc.*, the BTLA denied a charitable tax exemption to a corporation that owned and rented its property to an affiliate, consistent with its purpose "to receive, purchase, lease, hold and maintain real property associated with the provision of residential treatment and administrative services," "manage, sell or otherwise dispose of real property," and "assist [the affiliate] and [other] affiliate corporations in carrying out their missions." *Shallow River Properties, Inc.*, 2001 WL 345141, at *3. The BTLA concluded that the corporation "was organized and exists primarily, if not exclusively, to serve an affiliated organization," and did not have a direct charitable purpose of its own. *Id.*

In *Lewistown Hospital*, the Commonwealth Court of Pennsylvania found that Lewistown Hospital was eligible for a charitable tax exemption even though its corporate structure consisted of both for-profit and non-profit organizations. *Lewistown Hosp.*, 706 A.2d at 1273-74. Lewistown Hospital's parent company was formed for the purpose of "rais[ing] funds and administer[ing] those funds for the benefit of the Hospital." *Id.* at 1270. The parent company's subsidiaries owned and rented a medical office building and operated retail pharmacies and primary care centers. *Id.* The appellate court affirmed the trial court's assessment of the hospital's charitable purpose "without regard to the parent's or subsidiaries' function," and concluded that the hospital operated free from profit motive and was eligible for a charitable tax exemption. *Id.* at 1273-74.

*Sacred Heart Healthcare System, Lewistown Hospital*, and *Shallow River Properties, Inc.* are distinguishable. Based on their articles of incorporation, the taxpayer organizations in *Sacred Heart Healthcare System* and *Shallow River Properties, Inc.* were established for the purpose of assisting and supporting their affiliates, whereas GSMR's articles set forth the recognized charitable purpose of advancing education. *See MacDowell Colony*, 157 N.H. at 12 (Dalianis, J., concurring). Furthermore, *Sacred Heart Healthcare System* and *Lewistown Hospital* were decided based on Pennsylvania case law stating "that the activities of related organizations may not be considered when determining a single corporation's right to a charitable tax exemption." *Lewistown Hosp.*, 706 A.2d at 1274 (quotation omitted); *Sacred Heart Healthcare System*, 673 A.2d at 1025 ("Where a taxpayer divides itself into separate corporate entities, the taxpayer cannot insist that the Commonwealth ignore those distinct legal entities . . . . Thus, including the functions of SHHS's sister corporations in our analysis would require us to disregard the fact that SHHS is an independent entity." (citation omitted)).

■ By contrast, we have never held that, in determining whether an organization qualifies as a charity for property tax purposes, our review is *necessarily* constrained by the manner in which the organization has chosen to structure its legal existence, although we recognize that this consideration may have a bearing on the issue depending on the facts and circumstances of the particular case. *Cf. First Financial Group of N.H., Inc. v. State*, 121 N.H. 381, 386-87 (1981) (stating that "[i]n tax cases we do not completely disregard the corporate structure which the taxpayer has chosen for itself" and finding no double taxation based on the similarity between the taxes imposed and mutuality of identity between the parent corporation and its wholly-owned subsidiary, "considered together with all the facts of this case"). For example, if GSMR and its affiliates had been combined as a single corporate entity, and if the activities of that entity would qualify it for a charitable exemption, it is not clear why a different result should occur merely because the same charitable activities are performed through an organizational structure that consists of several affiliated entities.

Accordingly, we disagree with the City's position that, by virtue of servicing other lenders' loans, GSMR is categorically ineligible for a charitable tax exemption. *ElderTrust*, 154 N.H. at 697.

■ The City has not sufficiently developed its argument as to the second *ElderTrust* factor: that a charitable organization must be obligated to perform its stated purpose to the public. *ElderTrust*, 154 N.H. at 697-98. The trial court found that GSMR's articles limit its operations to those permitted for tax-exempt corporations under 26 U.S.C. § 501(c)(3) and that the Attorney General can enforce this limitation. On appeal, the City argues that the requirement in GSMR's articles that it "support[] the development of higher education and educational opportunities" is vague and does not create an enforceable obligation." Because the City makes but a passing reference to this argument, we decline to address it. *In the Matter of Thayer and Thayer*, 146 N.H. 342, 346 (2001) (an undeveloped legal argument is insufficient to warrant judicial review).

The City also appears to argue that GSMR is not obligated to perform its stated charitable purpose because, in its agreements with NHHELCO and NHHEAF, it contractually retains the right to assign or subcontract its obligations to another organization, including a for-profit entity. Our review of GSMR's agreements with NHHELCO and NHHEAF indicates that, notwithstanding any such rights, GSMR remains primarily liable to the lenders for the performance of the obligations it has undertaken. Accordingly, we conclude that the City has not demonstrated that it is entitled to judgment as a matter of law on the second *ElderTrust* factor.

Addressing the third factor, whether GSMR's land is "occupied by . . . and used directly for the stated charitable purposes," *ElderTrust*, 154 N.H. at 698, the City contends that the trial court erroneously relied on GSMR's tax-exempt status under 26 U.S.C. § 501(c)(3) when it found that GSMR used its property for a charitable purpose in 2008 and 2009. In its order, the trial court noted that, although 26 U.S.C. § 501(c)(3) requires that a charitable organization's property be used exclusively for exempt purposes, this requirement is not strictly construed. We disagree with the City that the trial court relied on GSMR's status as a 501(c)(3) company in finding that the property was used for tax-exempt purposes. The court considered how the lots were used in 2008 and 2009 and based its ruling on the determination that GSMR is a charitable organization. The City's argument that GSMR does not occupy its property for a charitable purpose because servicing and managing loans does not qualify as such a purpose is merely a restatement of the City's argument on the first factor, which has been addressed above. Finally, the argument that GSMR improperly claims a charitable tax exemption for property it leases to NHHEAF and NHHELCO at most raises a question of apportionment. *See Trustees &c. Academy v. Exeter*, 90 N.H. 472, 503 (1940) ("A building partly used for class rooms and partly as a dormitory clearly may receive a proportional division of value according to the parts assigned to the different uses."). Thus, the City is not entitled to judgment as a matter of law on the third factor.

The fourth *ElderTrust* factor prohibits a charitable organization's officers and members from deriving any pecuniary profit or benefit. *ElderTrust*, 154 N.H. at 698. The trial court rejected the City's argument that GSMR pays excessive salaries and bonuses to its employees because uncontradicted opinions of "outside experts" demonstrate that the salaries are reasonable. The court apparently relied on two letters prepared for GSMR by a compensation consultant, stating that the salary and benefits of its chief executive officer (CEO) were reasonable. On appeal, the City challenges the consultant's expert qualifications by suggesting that the lack thereof is evident from "[a] review of the letters." But while we agree, as stated *infra*, that these experts' unsworn declarations are not sufficient to establish GSMR's entitlement to summary judgment as to this factor, the City is the party that bears the burden of showing the absence of a genuine issue of material fact in connection with its own motion for summary judgment. Regardless of any deficiencies in the qualifications of GSMR's experts, there is a complete absence of any evidence, expert or otherwise, in support of the City's position that GSMR pays excessive salaries. *See* RSA 491:8-a, II. The City has not demonstrated that it is entitled to judgment as a matter of law on the fourth *ElderTrust* factor.

We therefore affirm the trial court's denial of the City's motion for summary judgment.

### B. GSMR's Motion for Summary Judgment

A party moving for summary judgment must submit in support of its motion "an affidavit based upon personal knowledge of admissible facts as to which it appears affirmatively that the affiants will be competent to testify." RSA 491:8-a, II. The other party may then oppose summary judgment by filing "contradictory affidavits based on personal knowledge . . . [or] an affidavit showing specifically and clearly reasonable grounds for believing that contradictory evidence can be presented at a trial but cannot be furnished by affidavits." *Id.* In other words, a party opposing summary judgment must do so "by affidavits or by reference to depositions, answers to interrogatories, or admissions, . . . set[ting] forth specific facts showing that there is a genuine issue for trial." RSA 491:8-a, IV; *see Omiya v. Castor*, 130 N.H. 234, 237 (1987).

■ Affidavits containing statements of legal conclusions and "expression[s] of purely personal opinion" are insufficient to entitle a party to summary judgment. *See Brown v. John Hancock Mut. Life Ins. Co.* 131 N.H. 485, 490-91 (1989); *N.E. Tel. & Tel. Co. v. City of Franklin*, 141 N.H. 449, 454 (1996) (affidavit, even of expert, that failed to set forth specific facts was insufficient to support conclusory assertions and conclusory assertions did not satisfy burden in opposing a summary judgment motion). "The affidavits should set forth evidentiary, and not ultimate, facts and should set forth the facts with particularity, mere general averments being insufficient." 49 C.J.S. *Judgments* § 332, at 404-05 (2009). Ultimately, summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RSA 491:8-a, III.

■ We find that genuine issues of material fact exist as to at least two of the four factors that GSMR must prove to qualify for a charitable tax exemption: that it is actually administered for a charitable purpose and that its income or profits are used for its established purpose. *ElderTrust*, 154 N.H. at 697-98.

In support of its motion, GSMR submitted Grondin's affidavit, in which the CFO stated that, as a result of GSMR's activities, students and parents in New Hampshire obtained access to lower-cost educational financing and New Hampshire educational institutions were assisted in securing reliable funds. In opposition to the City's motion for summary judgment, GSMR submitted the affidavit of its CEO, René Drouin, in which he stated that

GSMR "works to reduce the level of defaults and limit burdens both for the loan program and for borrowers." At oral argument, GSMR listed the evidence demonstrating its efficiency, *i.e.*, the means by which it performs its charitable purpose, as follows: the affidavits of Grondin and Drouin and the fact that GSMR supplies employees for four enterprises, thus eliminating middle management. GSMR admitted that it had not provided to the trial court a comparative analysis of the efficiency of its services.

Grondin's and Drouin's assertions that GSMR's loan servicing activity lowers the level of defaults and provides access to lower-cost funds for students and parents are general averments. Neither the affidavits nor GSMR's motion for summary judgment reference specific facts evidencing the savings that GSMR purportedly provides. *Cf. Baxter v. Szucs*, 227 N.W. 666, 667-68 (Mich. 1929) (affidavit was insufficient to support summary judgment where a statement in it as to the value of extensive legal services was opinion, not fact, given that "[t]he value [was] based upon a number of considerations, including the professional reputation and standing of the attorney, the difficulty and importance of the case, the amount of time spent and work performed, the sum involved, the result of litigation, etc."). Nor do Drouin's and Grondin's affidavits offer any basis for GSMR's assertion at oral argument that GSMR enhances efficiency because it eliminates middle management for all the organizations it staffs.

In addition, the affidavits do not support the trial court's finding that, if a for-profit servicer performed GSMR's functions, "th[e] cost would be passed on to the users of student loans." In his affidavit, Drouin states in conclusory fashion that the administrative structure, whereby GSMR "performs all of NHHEAF, NHHELCO's and NNEF's functions . . . reduces costs and supports [GSMR's] extensive community outreach program." Drouin also states, however, that "[t]he NHHEAF Network Organizations' structure is different from that of counterpart organizations in Massachusetts and elsewhere where each entity had its own set of employees." Thus, not only does the record provide no factual support for GSMR's assertion that its structure results in savings for borrowers, and that these savings exceed those that a for-profit entity would provide, but the record in fact reflects that the organizations' structure is novel and one for which few direct comparisons may be possible. Accordingly, we find that there exist genuine issues of material fact as to whether GSMR's activity is efficient and provides the stated public benefit of advancing education. *See MacDowell Colony*, 157 N.H. at 7 (to qualify for a charitable tax exemption, an organization must perform its stated purpose).

GSMR is correct that the City did not submit any evidence to contradict Drouin's and Grondin's affidavits, *i.e.*, evidence that GSMR does *not* help borrowers save. However, the City was not required to submit such evidence because GSMR failed to establish that there is no genuine issue as to those material facts. *Stewart v. Bader*, 154 N.H. 75, 86 (2006) ("Because . . . the moving party . . . did not meet his burden of showing that there were no genuine issues of material fact, . . . the opposing party . . . was not required to rebut his showing.") The City's failure to submit contradictory affidavits does not relieve GSMR of its burden as movant and entitle it to judgment as a matter of law.

Furthermore, genuine issues of material fact exist as to the fourth *ElderTrust* factor — whether GSMR uses its "income or profits . . . for any purpose other than the purpose for which [it] was established." *ElderTrust*, 154 N.H. at 698. According to GSMR, in 2008 and 2009, respectively, it earned a net profit of almost $2 million and over $3 million and held a surplus of over $37 million and almost $40 million. GSMR represented at oral argument that none of this surplus "goes to students" and that it retains the surplus in order to ensure sufficient reserves for any contractual liability it may incur. "A nonprofit charitable entity can take in surplus revenue without losing its tax-exempt status as a charity, provided that it uses those funds in a manner not inconsistent with its charitable purpose." 84 C.J.S. *Taxation* § 350, at 362 (2010). Similarly, a charitable entity may derive a profit from its operations.

> It is recognized that a corporation does not lose its exempt status under a statute which requires the payment of contributions or taxes merely because it has a net income or makes a profit or charges fees for its services. The destination of the income, and not the source of the income, determines the exemption.

*Institute for Trend Research v. Brown*, 100 N.H. 286, 290 (1956) (citations omitted); *see Young Women's Christian Ass'n v. Portsmouth*, 89 N.H. 40, 44-45 (1937) ("[A] charitable institution[ ] . . . may engage in business without loss of its charitable character. The test comes in the use made of the profits.") (decided under prior law). It is not apparent from the record whether the amount and purported use of GSMR's surplus to protect itself from future contractual liability is consistent with its stated charitable purpose of "supporting the development of higher education and educational opportunities" for students and parents.

In addition, genuine issues of material fact remain as to whether the salaries and benefits that GSMR pays to its employees are consistent with its charitable purpose. The compensation consultants' letters referenced earlier fall short of the type of evidence that is required for entry of

summary judgment: they do not constitute "affidavit[s] based upon personal knowledge of admissible facts as to which it appears affirmatively that the affiants will be competent to testify." RSA 491:8-a, II.

For the foregoing reasons, we find that the trial court erred in granting GSMR summary judgment and remand for further proceedings consistent with this opinion.

 GSMR argues that a determination of its eligibility for a charitable tax exemption will affect its tax liability only for 2009. This is correct as to Lots 18 and 19. The trial court affirmed the City's use of the September 2000 PILOT for the purposes of assessing tax for 2008 on consolidated Lots 18 and 19, and GSMR has not cross-appealed that ruling. Although the City took a contrary position in its response to GSMR's motion for summary judgment, it does not appear to argue on appeal that, if GSMR is found ineligible for a charitable tax exemption, its 2008 tax liability for Lots 18 and 19 should be revised upward from the amount the City has already assessed under the September 2000 PILOT. Insofar as it does advance such an argument, we reject it. See RSA 76:14 (2012); 16 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE: MUNICIPAL TAXATION AND ROAD LAW § 15.07, at 15-7 (2008) ("[T]he action to correct an assessment or add an excluded piece of property must occur before the expiration of the tax year for which the tax has been assessed."); Pheasant Lane Realty Trust v. City of Nashua, 143 N.H. 140, 142-44 (1998) (city lacked authority to assess supplemental taxes for under-assessed property based on an error in appraising the property). Here, the City did not revise its position as to GSMR's eligibility for a charitable tax exemption for Lots 18 and 19 until 2009.

GSMR is mistaken, however, in its assertion that its tax liability for 2008 on Lots 17 and 20 is no longer at issue. As regards Lot 17, the City assessed taxes on the lot based on its full value rather than under the February 2001 PILOT and the trial court agreed with the City that Lot 17 ceased to be subject to the February 2001 PILOT in 2004. Taxes for 2008 on Lot 20 were also assessed at full value. The trial court determined that both lots were exempt from taxation for 2008 because GSMR was a tax-exempt charitable organization that used Lots 17 and 20 for parking. The City timely appealed the dispositive determination that GSMR qualified for a tax exemption. GSMR's argument that the City should have also appealed the trial court's finding that GSMR used Lots 17 and 20 for parking misses the point: even if GSMR undisputedly used the lots for parking in 2008, it was exempt from taxes on the lots only if it was a charitable organization. See RSA 72:23, V. Accordingly, we leave it to the trial court to determine on remand GSMR's tax liability for 2008 on Lots 17 and 20.

We deem waived the City's argument that the trial court erred in striking certain exhibits submitted by the City because this argument was not raised in the notice of appeal. *See Progressive N. Ins. Co. v. Argonaut Ins. Co.*, 161 N.H. 778, 784 (2011).

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and HICKS, CONBOY and BASSETT, JJ., concurred.